**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JERMONT COX | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MARTIN HORN, | : | |
| <u>et al.</u> | : | NO. 00-5188 |

## RESPONSE TO SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PETITIONER'S MOTION FOR RELIEF FROM FINAL JUDGMENT PURSUANT TO FED. R. CIV. P. 60(b)(6)

Petitioner, a member of a drug-dealing organization, shot and killed a customer who was fighting with another gang member. He confessed to shooting the victim twice from close range, and was identified by an eyewitness who knew him and saw him kill the man. The state courts affirmed his convictions of first-degree murder, conspiracy, and possessing an instrument of crime on direct and collateral review. Petitioner filed a petition for writ of habeas corpus, which was denied by this Court in 2004. The Third Circuit affirmed the denial of relief in 2006. <u>Cox v. Horn</u>, 174 Fed. Appx. 84 (3d Cir. 2006) (non-precedential).

On June 20, 2012, petitioner filed a motion for relief from final judgment pursuant to Fed. R. Civ. P. 60(b)(6). In that motion, he sought to reopen the judgment based on the Supreme Court's decision in <u>Martinez v. Ryan</u>, 566 U.S. 1 (2012), which held that the ineffectiveness of state collateral counsel can sometimes be "cause" for procedural default. This Court denied 60(b) relief, and petitioner appealed. The Third Circuit held that the rules governing exceptions to the procedural default doctrine announced in <u>Martinez</u> could, in rare cases, form the basis for a proper 60(b) motion, and that full consideration of all the facts and circumstances was necessary to reach a conclusion. <u>Cox v. Horn</u>, 757 F.3d 113, 121-22 (3d Cir. 2014). The Third Circuit vacated this Court's order and remanded for the Court to consider the full facts and circumstances of

petitioner's 60(b) motion. On May 8, 2017, petitioner filed a supplemental memorandum in support of his 60(b) motion.

Respondents oppose petitioner's motion for 60(b) relief. Petitioner has not presented extraordinary circumstances that would justify reopening the judgment. The habeas proceedings that were closed in 2004 should remain closed and not be reopened.

## FACTS AND PROCEDURAL HISTORY

### A. Facts

On July 19, 1992, petitioner (also known as "Speedy") was employed as a lookout for a drug-selling business which operated out of the first floor of a building on the 200 block of West Queen Lane, in Philadelphia. Petitioner's friend, Larry Lee (also known as "Black") worked for the same illegal enterprise, picking up money and supplying drugs to sellers who operated "around the clock" at the location. At approximately 1:55 a.m., a fight erupted across the street when Lee shortchanged Lawrence Davis, a customer from the neighborhood. When Davis persisted in asking for his money back, Lee refused and began punching Davis, knocking him to the ground (N.T. 10/28/93, 2-3, 13-20, 35-58).

At that point, petitioner emerged from a nearby bar, the Queen Lane Lounge, carrying a six pack of beer. Upon seeing his confederate beating the victim, petitioner walked over to Lee's car, put down the six pack, and retrieved a .38 caliber gun from inside the car. He then stretched out his arm, took aim, and fired three shots at Davis, who had regained his footing and was standing approximately four feet away. After killing Davis with his gunshots, petitioner picked up a can of beer and drank some of it. He and Lee then fled from the scene in Lee's car (Id., 21-24, 38-39, 54, 67-78).

When police arrived they discovered the victim, already dead, lying face up on the sidewalk (N.T. 78-79, 86-88). He had sustained four gunshot wounds: a shot entering the right side of his

neck and exiting the left side; a shot entering the back of his right hand and exiting the front; a shot entering his right shoulder, traveling through his arm, and stopping in his chest, near the spine; and a shot entering the left side of his chest, exiting, and stopping in his left arm (N.T. 10/28/93, 88-92).

Police obtained a warrant for petitioner's arrest. They arrested him on January 14, 1993, and charged him with murder (N.T. 10/27/93, 4-11). He waived his constitutional rights and confessed to shooting the victim. According to petitioner, while Lee and the victim were fighting, Lee handed him a cocked gun. Petitioner told police he "fired two shots" at Mr. Davis, who fell to the ground. He said Lee then took the gun from him, and they drove away (Id., 12-23, 101-08). Petitioner further told police that, sometime later, he told his uncle and mother that he had "shot someone accidentally" (Id., 107). At no point did petitioner allege that anyone else had a gun or fired shots at Mr. Davis.

In addition to introducing petitioner's confession, the Commonwealth presented eyewitness testimony from Kimberly Little, who saw the crime from the window of her apartment across the street. Ms. Little saw the fight between Lee and the victim. She also saw petitioner take the gun from Lee's car, aim it at Mr. Davis, and fire three shots at him (N.T. 10/28/93, 2-3, 13-24). Her sister, Mary Little, was also inside the building. At 1:55 a.m., she heard "[a]bout three" gunshots. She got out of her bed and looked out her window. She saw petitioner throw a "shiny object" into the back seat of Lee's car and get into the passenger seat. Lee then got behind the wheel and drove off (Id., 67-71).

Assistant Medical Examiner Dr. Edwin Lieberman, who performed the autopsy on Mr. Davis, retrieved two bullets from the victim's body (N.T. 10/28/93, 92-94). Dr. Lieberman concluded that the victim was struck by "at least three bullets" (Id., 94, 101). Moreover, the shots

all came from the same direction: they were fired from the victim's right, traveled leftward, and were "pretty much horizontal" (Id., 94).

The Commonwealth's ballistics expert, Officer John Finor, explained that it would be unlikely petitioner could have accidentally fired three shots. This is especially true if the gun was a revolver, as the evidence strongly suggested.[1] As Officer Finor explained, "once you have two shots, and then three shots, especially if it's a revolver, you have to pull a double action trigger and/or cock the hammer every time you are going to fire that particular shot" (Id., 57-58). Officer Finor also examined the two bullets taken from Mr. Davis' body. The bullets were both .38 caliber (Id., 53-54, 61). One of the bullets, however, was "mutilated and gouged." As a result, Finor concluded, it could not be determined whether the bullets had been fired from the same gun (Id., 55-56, 61-62).

### B.  Procedural History

Following a hearing on October 27, 1993, the trial court, the Honorable Carolyn Engel Temin, found that petitioner's confession was voluntary and denied his motion to suppress it (N.T. 10/27/93, 62-65). Petitioner waived his right to a jury trial and, on October 28, 1993, Judge Temin found him guilty of first-degree murder, conspiracy, and possessing an instrument of crime (N.T. 10/28/93, 128). After finding that the Commonwealth had not proven the aggravating circumstances, the court sentenced petitioner to life imprisonment for murder. The trial court imposed no further penalty for the remaining charges.

---

[1]  The bullets retrieved from the victim's body were .38 special caliber (Id., 54). As Officer Finor explained, "[t]he vast majority of firearms in that caliber are revolvers" (Id., 56). Moreover, there were no fired cartridge cases found at the scene, further indicating that the gun was a revolver (N.T. 10/27/93, 83, 85; 10/28/93, 56).

On June 2, 1995, the Superior Court of Pennsylvania affirmed the judgments of sentence. Commonwealth v. Cox, 1303 PHL 1994 (Pa. Super. 1995). On April 30, 1996, the Supreme Court of Pennsylvania denied allowance of appeal. Commonwealth v. Cox, 546 EAL 1995 (Pa. 1996).

On May 28, 1996, petitioner filed his first petition under Pennsylvania's Post-Conviction Relief Act ("PCRA"). Following an evidentiary hearing, Judge Temin denied PCRA relief. The Superior Court affirmed on July 15, 1999. Commonwealth v. Cox, 2529 PHL 1998 (Pa. Super. 1995).The Supreme Court of Pennsylvania denied allowance of appeal on December 6, 1999. Commonwealth v. Cox, 514 EAL 1999 (Pa. 1999).

On June 26, 2000, petitioner filed a second, pro se PCRA petition. Judge Temin dismissed that petition as untimely on September 26, 2000. The Superior Court dismissed petitioner's appeal on February 16, 2001, because he failed to file a brief.

Meanwhile, on October 24, 2000, petitioner, represented by the Federal Defenders, filed a petition for a writ of habeas corpus in this Court, in which he raised eight claims: (1) trial counsel was ineffective for failing to impeach the Littles with their active probation status; (2) the prosecution violated Brady v. Maryland, 373 U.S. 83 (1963), by withholding the Littles' criminal records; (3) trial counsel was ineffective for failing to introduce evidence that the Littles were related to the victim; (4) trial counsel was ineffective for failing to impeach Kimberly Little with prior inconsistent statements; (5) trial counsel failed to refute the prosecution's assertion that petitioner worked as a "lookout"; (6) trial counsel failed to properly advise petitioner of his right to testify and, by failing to present petitioner's testimony, failed to present an adequate defense to first-degree murder; (7) state court counsel were all ineffective to the extent that they failed to raise all of the above claims; and (8) the cumulative prejudicial effect of the first six allegations of error entitles petitioner to habeas relief.

On July 24, 2003, Magistrate Judge Jacob P. Hart issued a report and recommendation in which he found all but one of petitioner's habeas claims were procedurally defaulted. With respect to the only claim reviewable on habeas, Judge Hart concluded that the state court's decision that petitioner was not prejudiced as a result of trial counsel's failure to impeach witnesses Kimberly and Mary Little based on their probationary status was not unreasonable under Strickand v. Washington, 466 U.S. 668 (1984).

On February 17, 2004, the Honorable Anita B. Brody overruled petitioner's objections and adopted the magistrate judge's report and recommendation. Judge Brody granted a certificate of appealability as to the merits of the ineffectiveness claim and the issue of whether all of the remaining claims were defaulted, and petitioner took an appeal to the Third Circuit. On April 3, 2006, the Third Circuit affirmed the denial of habeas relief, ruling that the state courts had not acted unreasonably under governing Supreme Court precedent in rejecting petitioner's ineffectiveness claim, and that the remaining claims were procedurally defaulted due to petitioner's failure to properly present them to the state courts for review. Cox v. Horn, 174 Fed. Appx. 84 (3d Cir. 2006) (non-precedential).

On January 22, 2008, petitioner, acting pro se, filed his third PCRA petition in state court. He claimed, inter alia, that he had after-discovered evidence to establish that the testimony of the Commonwealth's ballistics expert, Officer Finor, was unreliable. On November 21, 2008, Judge Temin dismissed the petition as untimely. On September 23, 2009, the Superior Court affirmed, ruling that the petition was time-barred and, in any event, meritless. Commonwealth v. Cox, 113 EDA 2009 (Pa. Super. 2009). The Court found that even had petitioner been able to bar or discredit Officer Finor's weapons identification testimony, it "would not have resulted in a different outcome…[because] [o]ther evidence in this case conclusively established that [petitioner] used the gun in question and shot Davis." Id., Mem. Op., 6.

6

On July 13, 2011, petitioner, represented by the Federal Defenders, filed a motion for discovery regarding the ballistics evidence from this case and his two other murder cases.[2] On February 7, 2012, Judge Brody granted petitioner's discovery request. No. 00-5289, Doc. No. 40; No. 10-2673, Doc. No. 17. Due to the retirement of the original examiners—Officer Finor and Officer John O'Hara—the Philadelphia Police Department reexamined the ballistics evidence and issued a new report. The report, prepared by Officer Kelly Walker, confirmed, as Officer Finor had testified, that one of the bullets taken from Mr. Davis (B-1) had been mutilated, noting that it was "distorted," "gouged," and bore "foreign markings." See Firearm Identification Unit Report, Case No. 92FIU-3195, Apr. 11, 2013, 1 (attached as Exhibit A, to Petitioner's Supplemental Memorandum in Support of Rule 60(b)(6) Motion). Unlike Officer Finor—who testified that, due to the damage, the bullets could not be compared—the new examiner opined that they were fired from different weapons. Id., 3.

On June 28, 2013, petitioner filed a fourth PCRA petition, relying upon the new ballistics report. He argued that the report "undermines the credibility of…eyewitness Kimberly Little" and could support a claim that he fired two shots, accidentally. On May 15, 2015, the PCRA court dismissed the petition. On December 23, 2016, the Superior Court affirmed, ruling that petitioner failed to satisfy the requirements of the newly-discovered fact exception to the PCRA time-bar because he was not diligent in seeking the ballistics evidence. Commonwealth v. Cox, 1671 EDA 2015 (Pa. Super. 2016).

Meanwhile, on June 20, 2012, petitioner filed a Motion for Relief from Final Judgment Pursuant to Fed. R. Civ. P. 60(b)(6) in federal court. In that motion, he sought to reopen the 2004

---

[2]  In April of 1995, petitioner was convicted in a joint trial of two counts of first-degree murder in the shooting deaths of Roosevelt Watson and Terrance Stewart. The jury imposed a life sentence for the murder of Mr. Watson, and a death sentence for the murder of Mr. Stewart. He has two other federal habeas petitions currently pending before this Court, challenging these two convictions (Nos. 00-5289 and 10-2673).

habeas judgment based on the Supreme Court's decision in <u>Martinez</u>. On May 23, 2013, Judge Brody ruled that the change in the law worked by <u>Martinez</u> is not the type of "extraordinary circumstance" which justifies relief under Rule 60(b). The Third Circuit vacated the district court's order and remanded for further consideration of petitioner's 60(b) motion, declining to adopt a bright-line rule that <u>Martinez</u> can never be the basis for Rule 60(b) relief. <u>Cox v. Horn</u>, 757 F.3d 113 (3d Cir. 2014). On May 8, 2017, petitioner filed a supplemental memorandum in support of his 60(b) motion, to which the Commonwealth herein responds.

## <u>APPLICABLE LEGAL STANDARDS</u>

### <u>Rule 60(b)</u>

Rule 60(b) allows a party to seek relief from a final judgment and request reopening of his or her case "under a limited set of circumstances including fraud, mistake, and newly discovered evidence." <u>Gonzalez v. Crosby</u>, 545 U.S. 524, 528 (2005).[3] Petitioner seeks to reopen his judgment under Rule 60(b)(6), the broadest provision of the rule, which states that the court may reopen a judgment "for any reason that justifies relief." Fed. R. Civ. P. 60(b)(6).

---

[3] The full text of the Rule states that upon motion and "just terms," a federal court may relieve a party from a final judgment, order, or proceeding for the following reasons:

> (1) mistake, inadvertence, surprise, or excusable neglect;
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
> (4) the judgment is void;
> (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
> (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

The broad language in Rule 60(b)(6) is subject to strict limitations. In order to demonstrate that he is entitled to relief, a petitioner must present evidence of "extraordinary circumstances" justifying the reopening of a final judgment. <u>Gonzalez</u>, 545 U.S. at 535; <u>see</u> <u>also</u> <u>Budget Blinds, Inc. v. White</u>, 536 F.3d 244, 245 (3d Cir. 2008); <u>Martinez-McBean v. Government of Virgin Islands</u>, 562 F.2d 908, 911 (3d Cir. 1977). Because of the special considerations of comity and federalism involved in habeas matters, 60(b) relief will only "rarely" be appropriate in habeas cases. <u>Gonzalez</u>, 545 U.S. at 535.

In <u>Cox</u>, the Third Circuit held that the rules governing exceptions to the procedural default doctrine announced by the Supreme Court in <u>Martinez</u>, could, in rare cases, form the basis for a proper 60(b) motion. The Court emphasized that it has long taken a "flexible, multifactor" approach to 60(b), and so the court declined to find that <u>Martinez</u> can *never* be part of a successful 60(b) argument.  757 F.3d at 123-24.  On the other hand, the Court emphasized that "much more" than <u>Martinez</u> is required to reopen a judgment.  <u>Id</u>. at 115.  For example, the petitioner must show that the previously defaulted claim of trial counsel's ineffectiveness has substantial merit. Furthermore, the older the conviction, the greater the state's interest in "repose and finality," weighing in favor of denying 60(b) relief.  <u>Id</u>. at 125.  The petitioner's diligence in bringing the claim should be taken into account.  <u>Id</u>. at 126.  And finally, the Third Circuit noted that 60(b) relief may be more readily available in a death penalty case. <u>Id</u>.

**Martinez v. Ryan**

Generally, "[b]efore a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court." <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 842 (1999). <u>See</u> <u>also</u> 28 U.S.C.A. § 2254(b)(1). "[I]f the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion

9

requirement would now find the claims procedurally barred. . . there is a procedural default for purposes of federal habeas." Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991)).

When a claim is procedurally defaulted, federal habeas review "is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[ ] will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him." Id. at 753 (emphasis omitted). Generally, "[a]ttorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error.'" Id. at 753 (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)).

In Martinez v. Ryan, the Supreme Court set forth a "narrow exception" to the general rule of Coleman: "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." Martinez, 566 U.S. at 9. This "narrow exception" has four requirements: "(1) the claim of 'ineffective assistance of trial counsel' was a 'substantial' claim; (2) the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the 'initial' review proceeding in respect to the 'ineffective-assistance-of-trial-counsel claim'; and (4) state law requires that an 'ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding[,]'" or "makes it virtually impossible for appellate counsel to adequately present an ineffective assistance [of trial counsel] claim on direct review." Trevino v. Thaler, 133 S.Ct. 1911, 1918 (2013) (quotation marks and citation omitted). In this context, a "substantial" claim of trial counsel's

ineffectiveness is one that "'has some merit,' analogous to the substantiality requirement for a certificate of appealability." Cox, 757 F.3d at 119, quoting Martinez, 132 S.Ct. at 1318-1319.

This equitable exception is so limited that it "ought not to put a significant strain on state resources." Martinez, 132 S.Ct. at 1319. Where a habeas petitioner argues that his defaulted claim of trial counsel's ineffectiveness should be excused due to collateral counsel's error, "a State may answer that the ineffective-assistance-of-trial-counsel claim is insubstantial, i.e., it does not have any merit or that it is wholly without factual support, or that the attorney in the initial-review collateral proceeding did not perform below constitutional standards." Id., at 1319. Moreover, even where a petitioner successfully demonstrates collateral counsel's ineffectiveness, "[a] finding of cause and prejudice does not entitle the prisoner to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." Id., at 1320.

**Ineffectiveness Standard**

The clearly established federal law regarding claims of ineffective assistance of counsel is found in Strickland v. Washington, 466 U.S. 668 (1984). Cullen v. Pinholster, 131 S.Ct. 1388, 1403 (2011). Under Strickland, judicial scrutiny of counsel's performance is "highly deferential" and counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 689-690. It is "the challenger's burden" to establish ineffectiveness. Premo v. Moore, 131 S.Ct. 733, 739 (2011). "To establish ineffective assistance of counsel a defendant must show both deficient performance by counsel and prejudice." Id.; Berghuis v. Thompkins, 130 S.Ct. 2250, 2264 (2010) (quotation marks omitted).

"To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'" Harrington v.

<u>Richter</u>, 131 S.Ct. 770, 787 (2011) (quoting <u>Strickland</u>, 466 U.S. at 688). "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." <u>Id.</u> (quoting <u>Strickland</u>, 466 U.S. at 689). "[T]hat is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." <u>Strickland</u>, 466 U.S. at 689 (quotation marks and citation omitted). "The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" <u>Richter</u>, 131 S.Ct. at 787 (quoting <u>Strickland</u>, 466 U.S. at 687). Counsel's performance must be assessed in light of "the prevailing professional practice at the time of the trial." <u>Bobby v. Van Hook</u>, 558 U.S. 4, 8 (2009) (per curiam). In addition, "counsel cannot be deemed ineffective for failing to raise a meritless claim." <u>Ross v. District Attorney of the County of Allegheny</u>, 672 F.3d 198, 211 n.9 (3d Cir. 2012).

To prove prejudice, "a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" <u>Richter</u>, 131 S.Ct. at 787 (quoting <u>Strickland</u>, 466 U.S. at 694). Prejudice "requires a substantial, not just conceivable, likelihood of a different result." <u>Pinholster</u>, 131 S.Ct. at 1403 (quotation marks and citation omitted).

## **DISCUSSION**

Petitioner is not entitled to relief from this Court's habeas judgment under Rule 60(b)(6). He failed to satisfy the narrow criteria for Rule 60(b) relief set forth by the Third Circuit in this case. Petitioner has not presented the type of extraordinary circumstances that would justify reopening the judgment.

**I.      Certain arguments in petitioner's Supplemental Motion may only be presented if he were to pursue (and obtain) permission to file a successive petition.**

Petitioner presents certain arguments in his motion that, though denominated as filed under Rule 60(b), must be deemed barred by AEDPA's restrictions on successive petitions. Specifically, petitioner claims that the 2013 ballistics report calls into question Kimberly Little's testimony and the prosecution's theory of the case (Petitioner's Supplemental Memorandum, 13). He further alleges that trial counsel was ineffective for failing to hire a ballistics expert who could have discovered that two guns were used in the shooting (Id., 16). Petitioner also now alleges that trial counsel was ineffective for failing to call Charles "Buster Reynolds, Tammy Williams, and Frances Shaw as witnesses, and that trial counsel was ineffective for failing to question Kimberly and Mary Little on inconsistencies in their testimony (Id., 16-18). Petitioner's attempt to litigate these brand new claims is improper and jurisdictionally barred.

In Gonzalez v. Crosby, 545 U.S. 524 (2005), the Supreme Court outlined the criteria for determining whether a Rule 60(b) motion filed by a habeas petitioner may properly be addressed on its merits as a true 60(b) motion or whether it is a second or successive habeas petition. A movant does not assert a "claim" sufficient to trigger AEDPA's successive petition requirements "when he merely asserts that a previous ruling which precluded a merits determination was in error—for example, a denial for such reasons as failure to exhaust, procedural default, or statute-of-limitations bar." Id. at 532 n.4. On the other hand, a motion that "seeks to add a new ground for relief" or "attacks the federal court's previous resolution of a claim *on the merits*" must be

considered a successive habeas petition because "alleging that the court erred in denying habeas relief on the merits is effectively indistinguishable from alleging that the movant is, under the substantive provisions of the statutes, entitled to habeas relief." Id. at 532 (emphasis in original). See also Pridgen v. Shannon, 380 F.3d 721, 727 (3d Cir. 2004) (where factual predicate of Rule 60(b) motion "attacks the manner in which the earlier habeas judgment was procured and not the underlying conviction, the Rule 60(b) motion may be adjudicated on the merits," but when motion "seeks to collaterally attack the petitioner's underlying conviction, the motion should be treated as a successive habeas petition").

Here, petitioner is jurisdictionally barred from presenting the new ballistics evidence and the claims of trial counsel's ineffectiveness that were not raised in his original habeas petition. "A Rule 60(b) motion that brings a new claim for relief or new evidence in support of a claim is in substance a successive habeas petition and should be treated accordingly." United States v. Jones, 2015 WL 525184, at *8 (E.D.Pa. Feb. 9, 2015) (Robreno, J.). Under AEDPA, a habeas petitioner must first seek permission of the Third Circuit before he files a successive petition. 28 U.S.C. § 2244(b)(3)(A).

## II.     Petitioner's presentation of a new ballistics report is unreviewable and, in any event, does not warrant Rule 60(b) relief.

Petitioner claims that the 2013 ballistics report calls into question Kimberly Little's testimony and the prosecution's theory of the case (Petitioner's Supplemental Memorandum, 13). In addition to being barred by AEDPA's restrictions on successive petitions, this aspect of his motion is also untimely and therefore must be dismissed for this reason as well. In any event, the ballistics evidence is not an extraordinary circumstance warranting reopening of the judgment under Rule 60(b)(6).

**A.  Petitioner's presentation of the new ballistics report is untimely.**

Even assuming petitioner's presentation of the new ballistics report was properly brought under Rule 60 at all, it should be dismissed for the additional reason that it is untimely. Although petitioner styles his motion as under Rule 60(b)(6), claims of newly discovered evidence should be assessed under Rule 60(b)(2), which explicitly applies to claims of new evidence.

Fed. R. Civ. P. 60(b)(2) allows a party to request relief from a judgment based on "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Rule 60(b)(2) contains a one-year deadline: a 60(b) motion based on new evidence must be brought within one year of the habeas judgment. See Fed. R. Civ. P. 60(c)(1) (providing that a prisoner's 60(b) motion must be raised before the court "within a reasonable time, and for reasons (1), (2), and (3) not more than one year after judgment. . . ." On the other hand, Rule 60(b)(6) allows a party to move for relief from judgment for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6).

Both rules 60(b)(2) and 60(b)(6) are "mutually exclusive": relief is unavailable under 60(b)(6) if it could have been requested under 60(b)(2). See Wright, Miller & Kane, Federal Practice and Procedure, Civil 3d, § 2864, *citing* Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 864 & n.11 (1988); Arrieta v. Battaglia, 461 F.3d 861 (7th Cir. 2006). For this reason, "Rule (60)(b)(6) cannot be used to evade the time limits of Rule 60(b)(2)." Rainey v. Wydner, 2006 WL 2927640, at *4 (E.D.Pa. Oct. 12, 2006) (Yohn, J.).

Petitioner's allegations based on the new ballistics report are untimely and should have been brought within one year of the district court's dismissal of his habeas petition, on February 17, 2005. Because petitioner did not meet that deadline, his new evidence should not be considered. See United States v. Pungitore, 2003 WL 22657087, at *6 (E.D.Pa. Oct. 24, 2003) (Van Antwerpen, J.) (finding motion based on claim of newly discovered evidence under Rule 60(b)(2)

time-barred because asserted more than one year after judgment denying habeas relief); Harper v. Vaughn, 272 F.Supp.2d 527, 532 n.8 (E.D.Pa. 2003) (DuBois, J.) (even if prisoner had identified any evidence or argued existence of new evidence that could not have been discovered earlier through exercise of due diligence, motion based on Rule 60(b)(2) would have been untimely because filed more than one year after order denying relief).

### B. In any event, a conflicting ballistics expert opinion is not an extraordinary circumstance justifying Rule 60(b)(6) relief.

Even if petitioner's allegations regarding the new evidence were assessed under Rule 60(b)(6), he still would not be entitled to relief. Petitioner claims that the new ballistics opinion he presents would have undermined Kimberly Little's testimony and supported his accidental shooting defense (Petitioner's Supplemental Memorandum, 13). He is wrong. Officer Walker's opinion would not have rendered Ms. Little's account of the murder incredible or changed the outcome of the trial.

First, the new ballistics report is not an extraordinary circumstance under Rule 60(b)(6) because petitioner was not diligent in pursuing it. A movant's diligence in pursuing review of his claims must be taken into account in a 60(b) analysis. Cox, 757 F.3d at 125. While petitioner sought discovery of the ballistics from this murder while litigating his separate capital case, he does not appear to have made any such requests in the course of litigating *this* case. Moreover, the state courts in this case specifically determined that the ballistics report did not constitute after-discovered evidence. Commonwealth v. Cox, 1671 EDA 2015 (Pa. Super. 2016), at 3, *citing* Commonwealth v. Cox, 146 A.3d 221, 230 (Pa. 2016) (denying petitioner's after-discovered evidence claim based on same ballistics report in his capital case). Petitioner admitted to shooting Mr. Davis and would have known whether more than one gun was used in the perpetration of the murder. Id. at 231. Thus, he could have sought independent ballistics testing at the time of trial or on direct appeal. Id. The state courts' analysis of petitioner's diligence in obtaining the ballistics

evidence applies with even greater force here, where relief under Rule 60(b)(6) requires a showing of extraordinary circumstances. See Gonzalez, 545 U.S. at 525.

Petitioner's claim that the ballistics report undermines the Commonwealth's case is also meritless. His argument focuses on a limited aspect of testimony from the Commonwealth's ballistics expert. At trial, Officer Finor testified that because one of the two bullets taken form the victim's body was "mutilated and gouged," it could not be determined if they were fired from the same gun (N.T. 10/27/93, 55-56, 61-62). Petitioner now offers a conflicting opinion by a different ballistics examiner, Officer Kelly Walker. Officer Walker observed, as did Officer Finor, that the second bullet taken from Mr. Davis' body was "distorted" and "gouged." Firearm Identification Unit Report, Case No. 92FIU-3195, Apr. 11, 2013, 1 (attached as Exhibit A to Petitioner's Supplemental Memorandum). Walker nonetheless opined that this second bullet was fired from a different gun (Id., 3). Based on his presentation of this conflicting expert opinion regarding the source of the bullets, petitioner claims he is entitled to 60(b) relief. His claim is meritless.

In light of the overwhelming evidence of petitioner's guilt, the conflicting expert opinion would not have changed the outcome of the trial. Two eyewitnesses, both of whom knew petitioner, identified him at trial. Kimberly Little saw petitioner walk out of a bar, retrieve a gun from Larry Lee's car, and shoot Mr. Davis three times (N.T. 10/28/93, 21-22). The other eyewitness, Mary Little, heard three gunshots. She then got out of her bed, went to her window, and saw petitioner throw a "shiny object" into Lee's car, and saw the two cohorts drive off (Id., 67-70).

Dr. Lieberman corroborated these firsthand accounts, testifying that the victim was, in fact, shot with at least three bullets (Id., 94, 101). He also concluded that all of the shots were fired from the same direction—the victim's right—and at the same horizontal angle (Id., 94). This further indicated that there was only one gunman. And petitioner himself admitted shooting the victim

from close range, without claiming to have seen anyone else fire a gun (N.T. 10/27/93, 101-08). This evidence overwhelmingly established that petitioner shot Mr. Davis, and that he did so with the intent to kill.

Petitioner's argument is largely based on his assertion that he could have used the new ballistics opinion to impeach Kimberly Little's account of the shooting. But even assuming arguendo that the trial court could have concluded, based on that opinion, that two guns were used—despite the evidence to the contrary—it would not render Ms. Little's account incredible. She testified that she saw petitioner retrieve a gun from Lee's car and fire it three times at the victim. This was a startling event, which she witnessed from across the street. She simply may not have seen petitioner, or someone else, using a second weapon during the assault.

In any event, petitioner's own statement, by itself, established his guilt. He told police he "fired two shots" at the victim (N.T. 10/27/93, 104). And despite his assertions, he did not, in fact, tell police he fired the shots accidentally; he merely said this was something he later told his uncle and his mother (Id., 107). Moreover, regardless of whether petitioner fired three times (as Ms. Little testified) or twice (as he claimed), he had to repeatedly pull the trigger, which refuted any claim that the shooting was accidental. See, e.g., Commonwealth v. Sanchez, 36 A.3d 24, 37-38 (Pa. 2011) (holding evidence sufficient to sustain first-degree murder conviction where medical examiner testified that decedent had died from multiple gunshot wounds and eyewitnesses identified defendant as shooter); Commonwealth v. Johnson, 985 A.2d 915, 920-21 (Pa. 2009) (specific intent to kill and malice for first-degree murder conviction found where defendant shot victim multiple times). This is particularly true since the weapon petitioner used was almost certainly a revolver. As Officer Finor explained, this made any claim of an "accident" even more unlikely because petitioner would need to "pull a double action trigger and/or cock the hammer

every time you are going to fire" (N.T. 10/28/93, 57-58). This important aspect of Officer Finor's testimony was not impeached in any way by petitioner's new ballistics opinion.

Petitioner's contention that he shot Mr. Davis by accident is further refuted by evidence that he was a "lookout" in the same drug enterprise as Larry Lee (N.T. 10/28/93, 3, 13-14, 16-18). When petitioner saw Lee fighting with the victim, he promptly did his job, retrieving a gun and acting to protect a senior member of his illicit drug gang (Id., 21). His flight after committing the crime (N.T. 10/27/93, 104-05; 10/28/93, 24, 68), reflected his consciousness of guilt, which further supported the trial court's verdict. See Commonwealth v. Rizzuto, 777 A.2d 1069, 1078 (Pa. 2001) ("evidence of flight shows a consciousness of guilt"); Commonwealth v. Dent, 837 A.2d 571, 576 (Pa. Super. 2003) ("[f]light does indicate consciousness of guilt…from which guilt may be inferred").

Petitioner's presentation of a conflicting, expert opinion on a relatively minor point—in the face of overwhelming evidence of his guilt—is not an extraordinary circumstance. It certainly does not justify the reopening of the final judgment.

**C. Trial counsel was not ineffective for not conducting an independent investigation of the ballistics evidence.**

Petitioner also claims that trial counsel was ineffective for not investigating the ballistics evidence prior to trial (Petitioner's Supplemental Memorandum, 16). As discussed above in Section I, this claim is jurisdictionally barred by AEDPA's restrictions on successive petitions. Only for the sake of completeness, respondents will briefly address the merits of petitioner's claim. Even if the claim were reviewable, he would be entitled to no relief.

Counsel's representation must be viewed in the context of the information available at the time of trial, not based on hindsight. Strickland, 466 U.S. at 689; Bell v. Cone, 122 S.Ct. 1843 (2002) (judicial scrutiny of counsel's performance must be highly deferential, and every effort must be made to avoid distorting effects of hindsight). Moreover, the reasonableness of counsel's

investigative decisions depends critically on the information supplied by his client. See Strickland, 466 U.S. at 691. Counsel cannot be ineffective for failing to foresee or prepare for what, at the time of his preparations, appear to be remote possibilities. Harrington v. Richter, 562 U.S. 86, 110 (2011) (counsel not ineffective for failing to retain forensic blood expert). Nor does counsel have an obligation to call his own expert to critically evaluate the prosecution's expert witness. See id. at 111 (Strickland does not require "for every prosecution expert an equal and opposite expert from the defense").

Here, petitioner cites no information available to trial counsel which would have suggested the need to further investigate the ballistics evidence. Petitioner had confessed to killing Mr. Davis and never claimed more than one gun was used to commit the murder. Kimberly Little similarly saw him shoot the victim without indicating that anyone had used another weapon. Moreover, Officer Finor's testimony regarding the ballistics evidence—that one of the bullets from the victim's body was too mutilated for comparison—neither supported nor contradicted petitioner's theory that he lacked an intent to kill. In light of this record, there was no reason for counsel to expend his limited time and resources to seek out an additional opinion to challenge Finor's conclusions.

Petitioner also cannot demonstrate Strickland prejudice, i.e., a reasonable probability that, had counsel only sought out additional testing of the ballistics, the outcome of the trial would have been different. He has not established that at the time of the trial—nearly a quarter century ago—he could have obtained an opinion similar to the one Officer Walker later provided. See Lockhart v. Fretwell, 506 U.S. 364, 372 (1993) (Strickland Court adopted "the rule of contemporary assessment" because it recognized that "from the perspective of hindsight there is the natural tendency to speculate as to whether a different trial strategy might have been more successful"). In any event, as previously discussed, the evidence of petitioner's intent to kill was overwhelming

and would not have been undermined by the new ballistics opinion he presents. Thus, his challenge to trial counsel's performance is without merit.

### III.   **Martinez v. Ryan does not justify Rule 60(b) relief here.**

Petitioner claims that his PCRA counsel was ineffective for declining to raise various allegations of trial counsel's ineffectiveness and that he is entitled to review of these claims under Martinez v. Ryan. However, his claims are too insubstantial to warrant review under Martinez and therefore cannot justify 60(b) relief.

### A. **The Supreme Court's decision in Martinez is not in itself an extraordinary circumstance.**

Petitioner argues that the Supreme Court's decision in Martinez v. Ryan sharply altered the procedural default doctrine and therefore is an extraordinary circumstance that must be a factor in this Court's 60(b) analysis (Petitioner's Supplemental Memorandum, 21-22). The Third Circuit already rejected that argument in this case, explaining that the change of law "wrought by Martinez" provides only part of the analysis. Indeed, as the Court stated, "much more is required." Cox, 757 F.3d at 115. While Martinez was a "remarkable" and "important" decision, it does not in itself warrant a grant of relief under Rule 60(b)(6). Id. at 124.

### B. **Petitioner's ineffectiveness claims are ineligible for review and relief under Martinez and Strickland.**

The Third Circuit found that "[w]hen 60(b)(6) is the vehicle through which Martinez is to be given effect, the claim may well need be particularly substantial to militate in favor of equitable relief." Id. Martinez is inapplicable here because petitioner has failed to demonstrate that PCRA counsel was ineffective for declining to pursue his claims of trial counsel's ineffectiveness, and his underlying claims of trial counsel's ineffectiveness are clearly not substantial. See id. ("A court need not provide a remedy under 60(b)(6) for claims of dubious merit that only weakly establish ineffective assistance by trial or post-conviction counsel.").

1.   **Petitioner cannot show that PCRA counsel was ineffective under Strickland.**

Under Martinez, petitioner must show that post-conviction counsel's course of conduct was ineffective under Strickland v. Washington. Martinez, 132 S.Ct. at 1318. This requires a demonstration that PCRA counsel's strategy was such that *no* competent attorney would have followed it and that there is a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding"—in this context, the state PCRA proceeding—"would have been different." Strickland, 466 U.S. at 697, 694.

Petitioner cannot demonstrate PCRA counsel's ineffectiveness here. In Martinez, the Court had before it a situation where collateral counsel had filed a petition that petitioner did not even know about, and that did not assert even a single claim but rather certified that there were no meritorious claims. The attorney in Martinez thus caused an utter preclusion of all collateral review. Here, PCRA counsel chose to pursue the claim that trial counsel was ineffective for failing to impeach the Little sisters with their probationary status. This claim was viable enough that counsel was able to obtain an evidentiary hearing in support of the claim. Petitioner's is an entirely different situation that is nowhere close to being akin to Martinez.

Moreover, under both the state constitutional right to PCRA counsel, and the "equitable" federal Martinez analysis that is not a matter of the federal Constitution, PCRA counsel is *presumed* effective in exercising reasonable selectivity in determining which issues to raise. PCRA advocacy is akin to appellate advocacy, which requires that an attorney narrow the issues, discarding weaker ones in favor of those with the greatest chance of success. Smith v. Robbins, 528 U.S. 259, 288 (2000) (focusing on claims more likely to prevail, "far from being evidence of incompetence, is the hallmark of effective appellate advocacy"; ineffectiveness of appellate counsel "difficult to demonstrate"); Jones v. Barnes, 463 U.S. 745, 751-52 (1983) (effective appellate counsel should not raise every non-frivolous claim, "but rather may select from among

them"); Buehl v. Vaughn, 166 F.3d 163, 174 (3d Cir. 1999) (effective appellate advocacy requires "reasonable selectivity in deciding which arguments to raise"); Sistrunk v. Vaughn, 96 F.3d 666, 670 (3d Cir. 1996) ("there is no duty to raise every possible claim").

Petitioner, however, has made no attempt to specifically address the decisions of PCRA counsel. Instead, he asserts that PCRA counsel "inexplicably" dropped several claims from the amended PCRA petition and presents the Court with arguments he believes counsel should have made. See Petitioner's Supplemental Memorandum, 13. That is not enough. Under Jones and Strickland, petitioner must argue that appellate counsel's decision to pursue certain arguments on appeal was "unreasonable." Cf. Jones, 463 U.S. at 754 (stating that second-guessing reasonable appellate counsel decisions "disserve[s] the very goal of vigorous and effective advocacy"). He has not—and cannot—demonstrate that the issues omitted by counsel were clearly stronger than the one advocated.

### 2. Petitioner's claims of trial counsel's ineffectiveness are too insubstantial to justify 60(b) relief.

Martinez is also inapplicable because petitioner's claims of trial counsel's ineffectiveness are clearly not substantial. He is not entitled to the reopening of the final habeas judgment on the basis of his underlying meritless claims.[4]

---

[4]  Petitioner suggests that this Court may consider the Third Circuit's supposed finding of "deficient performance" for trial counsel's failure to impeach the Little sisters with their probationary status when assessing his defaulted ineffectiveness claims under Martinez. See Petitioner's Supplemental Memorandum, 15. This argument is specious. On PCRA review, the state courts found that although trial counsel had no reasonable basis for failing to investigate the witnesses' criminal records, petitioner did not establish that he was prejudiced by counsel's actions in light of the ample evidence of his guilt. On federal habeas review, the Third Circuit made no explicit finding regarding trial counsel's performance. Rather, it determined that the state courts' assessment of prejudice was not contrary to Strickland. Cox v. Horn, 174 Fed. Appx. 84, 88 (3d Cir. 2006). That conclusion is binding law of the case that cannot be reopened.

<u>Petitioner's claim that trial counsel failed to properly advise him with respect to his right to testify is meritless.</u>

Petitioner argues that trial counsel was ineffective for failing to present an "adequate" defense and for failing to properly advise petitioner of his right to testify (Petitioner's Supplemental Memorandum, 15-16). He contends that his testimony was necessary at trial to support his claim that he shot and killed Lawrence Davis accidentally. On the contrary, it was eminently reasonable for counsel to advise petitioner not to testify in light of the totality of the circumstances.

Counsel knew that petitioner had provided a proffer to the Commonwealth, where he had admitted the following:

> I was getting off my shift, it was time for me to get off, Larry came to pick me up and a guy came up, I didn't know him at all, and he wanted to buy some drugs, Larry was serving him and I think he wanted more than Larry had so they got into an argument, the other guy didn't (sic) Larry was fighting another guy had came and tried to break up the fight and then he left. The fight had stopped and the guy that Larry was fighting said that he was going to get some other guys. *So I went to the car and got the gun from the driver's seat of the car and when I got back I shot the guy twice*, then me and Larry left and I went back to West Philly and Larry went back to Sheldon Street where he was staying with some girl named Tammy and her brother.

Jermont Cox Written Proffer, 5/23/93, attached as Exhibit A. A condition of the proffer was that in the event that petitioner testified as a witness at *any* trial and offered materially different testimony than he had set forth in his proffer, the Commonwealth would cross-examine him about the difference and would offer rebuttal evidence concerning petitioner's previous statements about the crime. <u>See</u> Proffer Letter, 5/14/93, attached as Exhibit B. That petitioner elected not to enter into a final agreement with the Commonwealth by no means precluded the possibility that the Commonwealth would utilize his statements. Moreover, as trial counsel was well aware, by petitioner's own account he shot the victim intentionally. Thus, trial counsel could not permit

petitioner to testify at trial that the shooting was accidental without suborning perjury. See Nix v. Whiteside, 457 U.S. 157 (1986) (counsel not ineffective for declining to cooperate in presenting perjured testimony).

In addition, petitioner had testified at the suppression hearing and was clearly not a strong witness. If anything, his testimony was helpful to the Commonwealth. For example, he volunteered that he knew that the police had been looking for him in connection with this murder for about two or three weeks before he was arrested, as he complained that police had been to the "houses" of various family members and told them about the crime (N.T. 10/27/93, 41). Furthermore, notwithstanding that his defense at the suppression hearing was that his Miranda waiver was unknowing because he was not aware that a death sentence was a possible penalty for murder, he readily admitted on cross-examination that he knew that murder sometimes means the death penalty (Id., 44). In light of petitioner's poor performance as a witness at the suppression hearing as well as the potentially devastating cross-examination he would have faced if he testified that the shooting was accidental, trial counsel reasonably advised him not to testify at trial.

Petitioner also alleges that trial counsel's "buck fever" strategy was not a viable defense. (Petitioner's Supplemental Memorandum, 16). Faced with a client who had admitted that he shot the victim but claimed it was an accident—notwithstanding the medical and ballistics evidence which refuted the accidental shooting theory—there was little else for counsel to do. Trial counsel questioned Officer Finor about "buck fever." He verified that the phenomenon existed whereby an individual fires a gun but neither remembers how many times he fired or what he was shooting at (N.T. 10/28/93, 64-65). The introduction of this phenomenon presented a possible explanation for petitioner's claim that he did not recall the number of times that he fired at the victim. Had the fact-finder accepted this account, it could have found that petitioner unknowingly shot the victim three times as a result of being in an excited state brought on by his possession of a gun, which

might have resulted in a verdict of third-degree murder. Thus, counsel cannot be ineffective for making this strategic decision. See Strickland, 466 U.S. at 690 ("strategic decisions made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"); Sistrunk v. Vaughn, 96 F.3d 666, 670 (3d Cir. 1996) ("[I]n a criminal defense, certain litigation decisions are considered 'fundamental' and are for the client to make….[A]ll other decisions fall within the professional responsibility of counsel.").

Petitioner's claim that trial counsel failed to refute the evidence that he was a "drug lookout" is meritless.

Petitioner contends that trial counsel failed to argue that petitioner was not a "drug lookout" but rather was gainfully employed (Petitioner's Supplemental Memorandum, 17-18). This claim is meritless.

The evidence presented at trial certainly established the Commonwealth's theory that petitioner was a drug lookout. Based on Kimberly Little's testimony about her observations of petitioner's comings and goings in her neighborhood for approximately two weeks before he shot and killed the victim, one would be hard pressed to reach any other conclusion but that he was a drug lookout. Furthermore, the fact that petitioner may have had gainful employment by no means disproves Ms. Little's testimony concerning the frequency with which she saw petitioner at the local illegal drug emporium. Thus, this claim of ineffective assistance fails.

Petitioner also suggests that trial counsel was unaware that the issue of petitioner's drug-related activities would be admitted at trial (Petitioner's Supplemental Memorandum, 17). However, there is no question that trial counsel was well aware of petitioner's involvement in the sale of drugs and the fact that this illegal drug activity was a motivating factor in the instant murder as well as the two other homicides to which petitioner had confessed. Indeed, as discussed above, some months before trial, petitioner, assisted by trial counsel, had entered into negotiations with the District Attorney's Office whereby petitioner offered to testify about his extensive drug

activities and those who were higher up in the organization, namely Larry Lee and Tim Walker. See Exhibits A and B. Since trial counsel assisted in the preparation of this document, he must have anticipated that the Commonwealth would elicit testimony of petitioner's particular drug activities that bore directly on the murder of Lawrence Davis.

Petitioner further claims that trial counsel was ineffective for failing to question Kimberly Little on whether she, too, was involved in the drug-selling business (Petitioner's Supplemental Memorandum, 18). Ms. Little acknowledged that her grandmother owned the store in which Larry Lee and petitioner conducted their illegal drug sales (N.T. 10/28/93, 29-30). In addition, she testified that she lived above the store as did various family members and that she had a beeper number to contact Larry Lee (Id., 36). By exploring this scenario, trial counsel could have hoped to elicit additional information which would further implicate Kimberly or her family members in the drug business, which might suggest that she was testifying against petitioner to protect herself or her family. However, given her unshaken denial that she or any of her relatives were involved in the drug-business that was conducted in the store, trial counsel could not succeed as portraying Kimberly as not credible for this reason. This failure, without more, does not meet Strickland's performance and prejudice components to demonstrate that counsel was ineffective.

Petitioner's claim that trial counsel was ineffective for failing to impeach Kimberly Little with an alleged prior statement is meritless.

Petitioner argues that trial counsel was ineffective for not impeaching Kimberly Little with a statement she allegedly made to Keith Harris, her brother-in-law and Mary Little's husband (Petitioner's Supplemental Memorandum, 18). He argues that, based on Keith Harris' statement, Kimberly Little was not in a position to see the shooting. Petitioner relies on an answer in his statement to the police, where Harris stated that Kimberly Little had told him that she was "across the street and after she heard the shots[,] she went to the corner and seen them, Black (Larry Lee) and Speedy (petitioner) pulling off." Petitioner's Supplemental Memorandum of Law, Exhibit B,

at 3. Harris gave this answer in response to the question "Did anyone else tell you that they had seen the shooting?" Petitioner's Supplemental Memorandum of Law, Exhibit B, at 2. Thus, according to Keith Harris, Kimberly Little had told him that she had in fact seen the shooting.

Moreover, Harris' reply that Kimberly said she was "across the street" is entirely consistent with her trial testimony that she watched from the window of her second-floor apartment, located in the building at 243 West Queen Lane which was *across the street* from where the victim was shot, as police discovered his body in front of 246 West Queen Lane (N.T. 10/27/92, 87). Furthermore, just as Kimberly testified at trial, after the shooting, she ran into her sister's bedroom which overlooked the intersection of New Hall Street and West Queen, i.e., *a corner*. There was simply no inconsistency between the statement that Kimberly gave to Keith Harris and her trial testimony. Thus, petitioner's claim of ineffectiveness is based on a misreading of the record and wholly meritless.

<u>Petitioner's claim that trial counsel was ineffective for not eliciting that Commonwealth witnesses Kimberly and Mary Little were related to the victim is meritless.</u>

Petitioner also claims that trial counsel was ineffective for failing to elicit that Kimberly and Mary Little were related to the murder victim to demonstrate their alleged bias in testifying against petitioner (Petitioner's Supplemental Memorandum, 19). He relies on a statement from Keith Harris, Mary Little's husband, as proof that the Little sisters were related to the victim. In his statement, Harris indicated that the victim was a "cousin by marriage" (Petitioner's Supplemental Memorandum, Exhibit B, at 1). While petitioner assumes that Harris and the victim could be cousins by marriage if Mary Little and the victim were cousins, this is not the only possibility. The phrase "cousin by marriage" is ambiguous, and might apply if the victim were married to one of Keith's own cousins and was not related at all to the Little sisters. Thus, the actual relationship between the victim and the Little sisters is unclear.

Moreover, the record establishes that, notwithstanding any familial relationship between the victim and the Little sisters, these witnesses were not motivated to help the victim. After the shooting they did not attempt to aid the victim as he lay dying on the street. The two women also avoided cooperating in the investigation altogether by leaving the vicinity hours after the shooting. By their actions, they demonstrated their complete lack of interest in either the victim or the successful apprehension of the killer. Thus, any attempt to impeach these witnesses based on an alleged bias on account of their supposed relationship to the victim would have been unconvincing. Accordingly, petitioner cannot show that trial counsel was ineffective for failing to pursue this baseless strategy. See United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999) ("There can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument"); United States v. Fulford, 852 F.2d 3, 9 (3d Cir. 1987) (same).

Petitioner's remaining ineffectiveness claims are jurisdictionally barred and, in any event, meritless.

Petitioner also alleges that trial counsel was ineffective for failing to question the Little sisters on inconsistencies in their accounts of the shooting (Petitioner's Supplemental Memorandum, 18) and for failing to call Charles "Buster" Reynolds, Tammy Williams, and Frances Shaw as witnesses (Id., 17). As discussed above in Section I, these are new claims for relief that are barred by AEDPA's restrictions on successive petitions. See Gonzalez, 545 U.S. at 532; Pridgen, 380 F.3d at 727. They are also meritless.

Trial counsel was not ineffective for failing to impeach Kimberly and Mary Little with discrepancies in their observations of petitioner and Larry Lee on the night of the murder. The two inconsistencies he identifies—both of which implicate peripheral issues—are: (1) whether petitioner drank beer after the shooting or fled immediately with Lee in Lee's car; and (2) whether petitioner had a "big, black" gun or a "shiny" gun (Petitioner's Supplemental Memorandum, 18). First, trial counsel *did* in fact ask Mary Little if she had observed petitioner or Larry Lee drinking

29

at the time of the murder (N.T. 10/28/93, 78). He also highlighted this inconsistency in the sisters' testimony in his closing argument (Id., 119). Accordingly, this claim is frivolous. Second, given that it was dark at the time of the shooting, it is hardly surprising that there was a trivial discrepancy in Kimberly and Mary Little's description of the color of the gun. Minor inconsistencies such as those that petitioner avers do not render testimony unreliable, nor are they fatal to the Commonwealth's case. See, e.g., Peterson v. Smith, 510 Fed. Appx. 356, 362 (6th Cir. 2013) (non-precedential) (rejecting claim that trial counsel was ineffective for not impeaching eyewitness with "minor inconsistencies" and "immaterial discrepancies").

Petitioner's claims that trial counsel was ineffective for declining to call Charles "Buster" Reynolds, Tammy Williams, and Frances Shaw as witnesses are also meritless. Initially, he offers no proof whatsoever that counsel failed to investigate these witnesses. Moreover, petitioner fails to cite anything in the record addressing counsel's reasoning in declining to call these proposed witnesses or any evidence that they would have been available to testify at trial.  Petitioner's undeveloped assertions are inadequate to rebut the presumption that trial counsel was effective in his representation. See Pinholster, 131 S.Ct. at 1406-07 (Strickland presumption that trial counsel performed competently extends to pre-trial investigation).

Moreover, counsel reasonably declined to call Buster Reynolds because the witness saw petitioner commit the crime in the exact manner Kimberly Little described: retrieving a gun from Larry Lee's car, aiming it at "Cool" (Mr. Davis), and shooting the victim. Reynolds recounted these observations to Keith Harris, who told police:

> The guy that was with Larry, his name is Buster. Buster said that Larry walked up to this guy named Blackj (sic) to buy some drugs and they got into an argument and they started fighting. Cool, Larry, got knocked down and Black said, go ahead Cool, you don't know whgat (sic) you're getting yourself into. Cool said, I'm not going nowhere. *The other guy, they call him Speedy, went to the car and got the gun.* By this time, Larry's getting up off the ground from the fight. Black said, go ahead man, I'm not gonna tell you no more.

> [B]y this time Speedy had gotten back with the gun and [S]peedy
> said, didn't he tell you to get the f*ck outta here. And aimed and
> shot. Speedy then went back to the car and told Black to [h]urry up
> and start the car. Then they drove off.

Petitioner's Supplemental Memorandum, Exhibit A, at 2 (emphasis added; capitalization altered).

Trial counsel would have been aware of this statement. Thus, trial counsel cannot be deemed

ineffective for declining to present a witness who would have decimated his sole line of defense.

Indeed, trial counsel could not have presented any eyewitnesses, as they could only have

refuted his defense. As counsel was aware, a key aspect of petitioner's statement—that he

supposedly received a cocked gun from Lee—was not true. As petitioner acknowledged at the

suppression hearing, his statement incorrectly said that the "weapon was handed to me by a male"

(N.T. 10/27/93, 48). He confirmed that he told this to his attorney (Id.). Counsel further knew that

petitioner had provided a proffer to the Commonwealth in which he admitted taking the gun from

Lee's car and shooting the victim with it. In light of this proffer, presenting eyewitnesses to support

petitioner's account would have amounted to suborning perjury. See Nix, 457 U.S. at 187. Thus,

petitioner cannot establish that he was prejudiced by counsel's failure to not call any alleged

eyewitnesses. See also Richter, 131 S.Ct. at 789-790 ("An attorney need not pursue an investigation

that would be fruitless, much less one that might be harmful to the defense."); Burger v. Kemp, 483

U.S. 776, 795 (1987) (recognizing counsel can reasonably decline to conduct investigations he believes

will prove fruitless).

**IV.    The other factors set forth by the Third Circuit in Cox v. Horn do not permit relief.**

In Cox, the Third Circuit found that the change in the law wrought by Martinez did not,

"without more," entitle habeas petitioners to relief under Rule 60(b)(6). This Court identified four

factors to be considered in assessing whether a petitioner seeking to reopen a judgment under

Martinez could obtain relief under Rule 60(b): (1) the delay between the new law (i.e., Martinez)

and the Rule 60(b) motion; (2) the movant's diligence; (3) any special consideration that should

be given to capital proceedings; and (4) the amount of time since the conviction and the conclusion of the original habeas petition. Cox, 757 F.3d at 125-26. Even considering these factors, petitioner is not entitled to 60(b) relief.

Timeliness of the 60(b) motion

In Cox, the Third Circuit warned that "unless a petitioner's motion for 60(b)(6) relief based on Martinez was brought within a reasonable time of that decision, the motion will fail." Cox, 757 F.3d at 116, citing Fed. R. Civ. P. 60(c)(1). The court noted that petitioner filed his 60(b) motion "roughly ninety days after Martinez" and that this was "close enough to that decision to be deemed reasonable."

Petitioner's diligence

The Cox court also found that the movant's diligence in pursuing review of his claims must be taken into account. Cox, 757 F.3d at 125. A habeas petitioner should be limited to arguments he diligently pursued in his original proceedings and not be permitted to raise entirely new arguments in a 60(b) motion. In his habeas petition, petitioner raised the following claims of ineffective assistance of trial counsel: (1) failure to investigate Kimberly and Mary Little with their probationary status; (2) failure to introduce evidence that the Little sisters were related to the victim; (3) failure to investigate and impeach Kimberly Little with a statement from Keith Harris; (4) failure to refute the Commonwealth's evidence that petitioner was a drug lookout; and (5) failure to present an adequate defense to first-degree murder and properly advise petitioner about his right to testify. While petitioner was diligent in pursuing these claims, his delay in bringing the entirely new ineffectiveness claims for the first time in his 60(b) motion weighs against a finding of diligence. Moreover, as discussed above, his delay in seeking the ballistics evidence which he substantially relies on now also militates against such a finding. See Commonwealth v. Cox, 1671

EDA 2015 (Pa. Super. 2016) (finding that petitioner was not diligent in pursuing ballistics evidence).

Special consideration for capital cases

Although the murder conviction at issue here was not itself a capital judgment, the Third Circuit noted that it was "significant" that the judgment was an aggravator for a different murder conviction of petitioner's that was a capital case. Id. at 126. However, the Third Circuit also observed that this Court "failed to consider how, *if at all*, the capital aspect of this case…would figure into its 60(b)(6) analysis" and offered no opinion on how this Court should weigh this factor on remand. Cox, 757 F.3d at 124, 126 (emphasis added).

While the Third Circuit has, at points, adopted a "death is different" standard in the context of equitable rules, that precedent has been limited by subsequent Supreme Court cases. Although petitioner's 60(b) motion does not technically involve equitable tolling, habeas jurisprudence about what constitutes extraordinary circumstances in the equitable tolling context offers guidance here. In Fahy v. Horn, the Third Circuit discussed equitable tolling in the context of a time-barred capital case. 240 F.3d 239 (3d Cir. 2001). The court referred to the general rule that "death is different" and determined that "less than extraordinary circumstances" would provide a sufficient basis for equitable tolling in the capital context. Id. at 245. However, the Supreme Court rejected this approach in Lawrence v. Florida, 549 U.S. 327, 336-37 (2007) and Holland v. Florida, 560 U.S. 631, 645 (2010). Although both of these cases were capital, the Supreme Court required that the petitioner show "extraordinary" circumstances, just the same as any other non-capital habeas petitioner. Holland, 560 U.S. at 649; Lawrence, 549 U.S. at 336.

Additionally, even if this Court were to give special consideration to the "capital aspect" of this case, it is nonetheless important to note that *this* case is not capital. Moreover, the jury found *two* other aggravating factors in arriving at petitioner's death sentence for the murder of

Terrance Stewart. In total, the jurors found three aggravating circumstances: petitioner was paid to commit the murder (42 Pa.C.S. § 9711(d)(2)); in killing Stewart, he created a grave risk of death to another person (42 Pa.C.S. § 9711(d)(7)); and he had been convicted of another murder, for killing Lawrence Davis (42 Pa.C.S. 9711(d)(11)). The jury unanimously found that these aggravating factors outweighed petitioner's mitigating circumstances, that he acted under extreme duress (42 Pa.C.S. 9711(e)(5)) and other evidence of mitigation based on his upbringing (42 Pa.C.S. 9711(e)(8)). Thus, petitioner is not entitled to a reopening of the judgment simply because the jury found the instant conviction to be one aggravating factor among several in his subsequent capital case.

<u>Timing of the underlying conviction and habeas proceedings</u>

A court can also "consider whether the conviction and initial federal habeas proceeding were only recently completed or ended years ago." <u>Cox</u>, 757 F.3d at 125. The long passage of time between petitioner's conviction, habeas petition, and 60(b) motion weighs against him.

Petitioner's habeas petition was dismissed nearly eight years before he filed his 60(b) motion. He was found guilty of first-degree murder over *eighteen years* before filing the motion. Petitioner's case is long-closed, and this factor strongly militates against granting equitable relief under Rule 60(b). <u>See</u> <u>Moolenaar v. Government of Virgin Islands</u>, 822 F.2d 1342, 1346 (3d Cir. 1987) (Rule 60(b)(6) motion was not filed "within a reasonable time" when it was filed nearly two years after entry of judgment sought to be reopened). As the <u>Cox</u> court observed, "[c]onsiderations of repose and finality become stronger the longer a decision has been settled." <u>Cox</u>, 757 F.3d at 125, noting <u>Gonzalez v. Crosby</u>, 125 S. Ct. 2641, 2650-51 (2005) (cautioning against 60(b)(6) relief in "cases long since final" and "long-ago dismissals").

Thus, even if overlooking the inapplicability of <u>Martinez</u> to petitioner's underlying ineffectiveness claims, petitioner still fails to demonstrate extraordinary circumstances based on

the remaining Cox factors. He has not demonstrated any circumstances that would justify reopening his final judgment. No relief is due.

## CONCLUSION

For the foregoing reasons, this Court should dismiss the instant motion for relief from judgment pursuant to Rule 60(b) without a hearing and hold that no probable cause exists for the issuance of a certificate of appealability.

Respectfully submitted,

*/s/ Simran Dhillon*

SIMRAN DHILLON
Assistant District Attorney

*/s/ Max C. Kaufman*

MAX C. KAUFMAN
Acting Chief, Federal Litigation

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| **JERMONT COX** | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **MARTIN HORN,** | : | |
| <u>et al.</u> | : | **NO. 00-5188** |


<u>**CERTIFICATE OF SERVICE**</u>

I, SIMRAN DHILLON, hereby certify that on November 27, 2017, I electronically filed and served a copy of the foregoing upon Stuart Lev, Esq., through the Eastern District of Pennsylvania's Electronic Case Filing (ECF) system.


Dated:  November 27, 2017          */s/ Simran Dhillon*

_____
SIMRAN DHILON
Assistant District Attorney
Philadelphia District Attorney's Office
Three South Penn Square
Corner of Juniper and S. Penn Square
Philadelphia, PA 19107-3499