IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JERMONT COX,                              :
                                          :
                        Petitioner,       :        CIVIL ACTION NO. 00-5188
                                          :
            v.                            :
                                          :
MARTIN HORN, CONNOR BLAINE,               :
THE DISTRICT ATTORNEY OF THE              :
COUNTY OF PHILADELPHIA, and THE           :
ATTORNEY GENERAL OF THE STATE             :
OF PENNSYLVANIA,                          :
                                          :
                        Respondents.      :

## MEMORANDUM OPINION

Smith, J.                                                        August 28, 2018

In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court of the United States held that error by post-conviction counsel can constitute cause to overcome the procedural default of substantial ineffective assistance of trial counsel claims. The petitioner here, convicted of first-degree murder in 1993, moved for relief pursuant to Federal Rule of Civil Procedure 60(b)(6) on the heels of *Martinez* in 2012. He argued that *Martinez* permitted the district court to consider the merits of ineffective assistance of trial counsel claims the court previously deemed procedurally defaulted during the court's initial consideration of his section 2254 habeas corpus petition in 2004. While the district court denied the Rule 60(b)(6) motion, the Third Circuit vacated and remanded, holding that while *Martinez* alone cannot entitle a petitioner to 60(b)(6) relief, the combination of *Martinez* and additional factors, not considered by the district court, could.

Roughly concurrent with the petitioner's *Martinez* motion, the Commonwealth of Pennsylvania reexamined ballistics evidence from his 1993 trial. Although the ballistics

evidence at trial was inconclusive as to whether the two bullets recovered from the murder victim originated from the same gun, the new ballistics report in 2013 concluded that they did not. The petitioner therefore filed a second Rule 60(b)(6) motion, arguing that the new ballistics report is an extraordinary circumstance permitting relief from the court's previous denial of habeas relief.

Currently before the court are the petitioner's two Rule 60(b)(6) motions—the first on remand from the Third Circuit, and the second based on the ballistics evidence. Following a stay of federal habeas proceedings to allow the petitioner to exhaust state remedies, the parties filed supplemental memoranda on the motions. As explained below, the court finds that it lacks jurisdiction over the petitioner's Rule 60(b)(6) ballistics motion because that motion is a second or successive petition lacking appellate authorization. Additionally, even if the motion was not an unauthorized second or successive petition, it is untimely and lacks merit because the new ballistics report is consistent with the petitioner's own admission that he fired two shots, belying his defense of accident. As for his motion based on *Martinez*, although the petitioner's murder conviction in this case served as an aggravating factor towards a death sentence in a subsequent murder case, and although the petitioner has diligently pursued his defaulted ineffective assistance of trial counsel claims, those claims are neither meritorious nor substantial, as required by *Martinez*. Accordingly, the court will deny the petitioner's Rule 60(b)(6) motions.

## I.    PROCEDURAL HISTORY

In recounting the 25-year procedural history of this case, the court borrows liberally from the Third Circuit's relatively recent procedural recitation, beginning with the 1993 trial of the petitioner, Jermont Cox ("Cox").

> On October 28, 1993, following a bench trial before the Hon. Carolyn Engel Temin of the Court of Common Pleas of Philadelphia County, Cox was

convicted of first-degree murder, criminal conspiracy, and possession of an instrument of crime in connection with the July 19, 1992 shooting death of Lawrence Davis, and was sentenced to life imprisonment.

In a statement he gave to the police at the time of his arrest, Cox confessed to shooting Davis, but said that the shooting had been accidental. He and a friend, Larry Lee, he said, had gone to a drug house operated by Lee. While they were outside drinking, Lee got into a dispute with Davis that escalated into a physical altercation. At some point, Lee handed Cox a gun that was already cocked. Cox shot twice, hitting Davis, and then handed the gun back to Lee. According to Cox, he later told family members that the shooting had been an accident.[1]

To prove at trial that Cox had the requisite intent for first-degree murder, the Commonwealth presented the testimony of Kimberly Little, an eyewitness. Little testified that Cox and Lee worked for a drug organization that was run out of an apartment in her building: Cox was a "lookout" and Lee supplied the operation's drugs. On the night of Davis' death, Little saw from her window an argument erupt between Davis and Lee. According to Little, Cox then exited a local bar with a six-pack of beer, approached the two men, placed the six-pack on the hood of Lee's nearby car, retrieved a gun from the car, walked to within four feet of Davis, and shot him three times. Cox stopped to drink a beer, and he and Lee left in Lee's car.

The Commonwealth's other witnesses were Kimberly Little's sister, Mary Little; the medical examiner; and a ballistics expert. Mary Little confirmed that Cox and Lee were neighborhood drug dealers and that she saw them drive off together after the shooting. The medical examiner asserted that Davis had four wounds caused by at least three bullets,[2] and the ballistics expert explained that it was unlikely the shooting was accidental given the number of shots fired.[3]

---

[1] The relevant portions of Cox's statement are as follows:

> When I got to where Larry was, he handed me the gun. He took it from his waist and handed it to me. It was silver, .357 or .38, a pretty big gun. I was really not sure which.

> When I got the gun, it was already cocked. That's when I fired two shots. When I fired the shots, I was [approximately two feet from the victim].

> After the two shots, I saw that he was hit and I [sic] fell to the ground. Larry then took the gun and we left.

Trial Tr. Oct. 27, 1993, at 104. After being asked whether he ever talked to Larry Lee about the shooting, Cox replied, "He just said[,] 'What's done is done. The police aren't going to look on it as an accident.'" *Id.* at 106–07. Finally, Cox stated that he had told his uncle and mother about the murder, explaining to them that "Larry had a scuffle[,] and I shot someone accidentally." *Id.* at 107.

Testifying at his suppression hearing, Cox referred to the shooting as "accidental," and appears to offer contradicting information about the location of the murder weapon at the time of the shooting: "In this statement it says this weapon was handed to me by a male which [sic] was fighting the deceased. That makes it seem a little bit worse than what it is." *Id.* at 44, 48.

[2] The medical examiner also opined that "all the shots are coming from the right side and are pretty much horizontal and proceeding leftward." Trial Tr. Oct. 28, 1993, at 94.

[3] Specifically, the ballistics expert's testimony as to an accidental shooting is as follows:

> [C]ertainly firearms can be accidentally fired, and I'm talking about not the firearm being the cause, but an accidental or unintentional trigger pull. There can be malfunctions in the firearm.

> With three shots being fired, it kind of like multiplies that possibility unlikely [sic]. One shot, especially without having the firearm, we can't tell whether it was defective, I have no firearm submitted, I don't know if it was accidentally discharged by the shooter, but once you

Trial counsel filed post-verdict motions on Cox's behalf. Cox also filed a motion pro se alleging trial counsel's ineffectiveness and requesting the appointment of new counsel. In February of 1994, Judge Temin held a hearing on the post-verdict motions. At the hearing, Cox testified in support of his pro se motion and outlined trial counsel's alleged failings: trial counsel (1) failed to present testimony from various character witnesses; (2) failed to find a witness, identified by Cox, who would have testified that "guys from the neighborhood" forced Kimberly Little to give a false statement to the police; (3) failed to review paperwork that Cox provided him; and (4) dissuaded Cox from taking the stand in his own defense. In response, trial counsel stated that he found himself in "a very untenable position" and asked that he be permitted to withdraw. Judge Temin denied the request as well as the pro se motion, finding Cox's claims of ineffectiveness to lack merit. She later denied the counseled post-verdict motions.

Cox, still represented by trial counsel, appealed his conviction, challenging the sufficiency of the evidence and the admission of evidence relating to uncharged drug activity. In June of 1995, the Pennsylvania Superior Court affirmed the judgment of sentence. Cox then filed a pro se petition for allocatur in the Pennsylvania Supreme Court, raising claims of trial counsel's ineffective assistance at the trial and on appeal. New counsel was appointed for Cox and submitted a supplemental allocatur petition. The Supreme Court denied allocatur in April of 1996. . . .[4]

The following month, Cox filed a pro se petition under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. Ann. §§ 9541–9546. The attorney who had represented Cox in his petition to the Pennsylvania Supreme Court was again appointed to represent Cox in his collateral review proceeding under PCRA. Counsel filed an amended PCRA petition asserting

---

have two shots, and then three shots, especially if it's a revolver, you have to pull a double action trigger and/or cock the hammer every time you are going to fire that particular shot.

Trial Tr. Oct. 28, 1993, at 57–58. The ballistics expert also explained that he could not determine whether the two bullets recovered from Davis's body originated from the same firearm:

There are insufficient microscopic characteristics to permit a positive identification between the two bullet specimens, one bullet specimen being mutilated and gouged, the other projectile being constructed of the copper alloy jacket. There were [sic] a lack of markings to identify them as both being fired from the same firearm.

*Id.* at 55. Lastly, the ballistics expert opined that the two recovered .38 special caliber bullets likely originated from a revolver:

The vast majority of firearms in that caliber are revolvers. However, there are semiautomatic pistols also in that caliber. Due to the lack of no fired cartridge cases submitted to our unit, that would be an indicator that it is a revolver, but it doesn't rule it out, that it's not a semiautomatic.

*Id.* at 54, 56.

[4] The Third Circuit noted that by this time,

Cox had also been convicted of the 1992 first-degree murders of Roosevelt Watson and Terence Stewart, both of whom he aided Lee in killing. Cox was sentenced to life imprisonment for the murder of Watson and death for the murder of Stewart. His conviction for murdering Davis was found to be an aggravating factor in support of his capital sentence. *See Commonwealth v. Cox*, 983 A.2d 666, 673–75 (2009).

*Cox v. Horn*, 757 F.3d 113, 117 n.1 (3d Cir. 2014) ("*Cox II*") (citation altered).

claims of ineffective assistance of trial counsel. . . .[5] Judge Temin, sitting as the PCRA court, held a hearing at which PCRA counsel chose to proceed on only one of the multiple claims of trial counsel's ineffectiveness: failure to impeach the Littles with their criminal records and motive to curry favor with the Commonwealth to gain leniency in their own cases.

On August 28, 1998, Judge Temin denied postconviction relief, finding that Cox had not been prejudiced by trial counsel's failure to impeach Kimberly and Mary Little with their criminal records because evidence aside from their testimony established his guilt. The Superior Court affirmed in July of 1999 and the Supreme Court denied allocatur in December of that year. Cox filed a second PCRA petition pro se, alleging ineffective assistance claims against trial and PCRA counsel. Judge Temin dismissed the petition as untimely, and the Superior Court affirmed after Cox failed to file a brief.

In October of 2000, Cox, now represented by the Federal Defender, filed a petition for a writ of habeas corpus in the U.S. District Court. The petition raised eight grounds for relief: (1) six claims of ineffective assistance of trial counsel; (2) one violation of *Brady v. Maryland*, 373 U.S. 83 (1963); and (3) a claim of cumulative error. In July of 2003, a magistrate judge issued a report and recommendation ("R & R") in which he determined that the ineffective assistance claims abandoned by PCRA counsel before the PCRA court, as well as the Brady and cumulative error claims, were procedurally defaulted. He reviewed the remaining claim of ineffective assistance—trial counsel's failure to impeach the Littles with their criminal records—and concluded that the Superior Court's decision rejecting that claim was neither "contrary to" nor an "unreasonable application" of established federal law. [*See* 28 U.S.C. § 2254(d)(1).] Cox filed objections to the R & R, arguing that PCRA counsel's unilateral decision to abandon claims constituted cause to overcome the procedural default bar. In August of 2004, the District Court rejected Cox's objections, adopted the R & R, and dismissed the habeas petition. . . . We affirmed on appeal. *Cox v. Horn*, 174 F. App'x 84 (3d Cir. 2006) [("*Cox I*")].

Six years later, on June 20, 2012, Cox filed a motion pursuant to Federal Rule of Civil Procedure 60(b)(6) seeking relief from the District Court's order of dismissal due to the intervening change in procedural law occasioned by the March 20, 2012 decision of the Supreme Court of the United States in *Martinez v. Ryan*. The Court held in *Martinez* that, under certain circumstances, error by post-conviction counsel can constitute cause to overcome the procedural default of claims alleging trial counsel's ineffective assistance. Cox argued that it was only due to PCRA counsel's ineffective assistance at the initial PCRA proceeding that

---

[5] The Third Circuit noted that Cox's counseled PCRA petition raised the following ineffective assistance of trial counsel claims:

> The counseled PCRA petition claimed that trial counsel had provided constitutionally deficient representation when he failed to impeach the Little sisters with (1) the fact that they had charges pending against them when they first gave statements to the police, were eventually convicted of lesser charges, and were on probation at the time of trial; (2) their alleged familial relationship to the murder victim, Davis; and (3) a prior inconsistent statement by Kimberly Little. Trial counsel was also allegedly deficient for failing to present evidence of Cox's lawful employment.

*Cox II*, 757 F.3d at 117 n.2.

his claims of ineffectiveness against trial counsel had been abandoned and were now procedurally defaulted.

On May 23, 2013, the District Court denied Cox's motion, finding that "Martinez's change of law, without more," was not cause for relief. In a separate July 2, 2013 order, the District Court issued a certificate of appealability on the "legal question" of "whether the change in law resulting from Martinez constitutes extraordinary circumstances that would warrant relief" under Rule 60(b)(6).

*Cox II*, 757 F.3d at 116–18 (internal citations to appellate record omitted and case citations altered). On appeal, the *Cox II* court held that Rule 60(b)(6) relief requires "much more" "than the concededly important change of law wrought by *Martinez*." *Id.* at 115 (internal quotation marks omitted). However, in reaffirming a "flexible, multifactor approach to Rule 60(b)(6) motions," the court vacated the district court's May 23, 2013 order and remanded for a determination of whether, with supplemental briefing, the petitioner could demonstrate "much more" than just *Martinez*. *Id.* at 115, 122, 126.

Before filing his June 20, 2012 Rule 60(b)(6) motion, Cox also moved for discovery of ballistics evidence and examination records in the federal habeas proceedings associated with the Watson and Stewart murders. *See* Civil Action No. 00-5289, Doc. No. 32; Civil Action No. 10-2673, Doc. No. 12. The Honorable Anita B. Brody granted Cox's discovery motion on February 7, 2012, which apparently spurred the Commonwealth to reexamine the ballistics evidence in the Davis murder. *See* Civil Action No. 00-5289, Doc. No. 40; Civil Action No. 10-2673, Doc. No. 17. The officers conducting the reexamination, dated April 23, 2013, concluded that the two bullets recovered from Davis's body, "when compared against each other, were NOT fired from the same firearm." Suppl. Mem. Supp. Pet'r's Mot. Relief Final J. Pursuant Fed. R. Civ. P. 60(b)(6) ("Pet'r's Suppl. Mem."), Ex. A at 3, Doc. No. 95-1. The officers noted that their examination and the previous examination were not in complete agreement. *See id.* Arguing that the ballistics reexamination undermines the district court's and Third Circuit's rationale in

denying habeas relief, Cox filed another Rule 60(b)(6) motion on August 5, 2013. *See* Pet'r's Mot. Relief Final J. Pursuant Fed. R. Civ. P. 60(b)(6) at 1, Doc. No. 82.

Then-Chief Judge Petrese B. Tucker reassigned the instant case from Judge Brody's calendar to the undersigned's calendar on June 10, 2014. *See* Doc. No. 83. At the request of counsel, the court stayed each of Cox's three federal habeas cases due to pending PCRA petitions in state court challenging the three murder convictions on the basis of the new ballistics evidence. *See* Order at 1–2, Doc. No. 90; *see also* Civil Action No. 00-5289, Doc. No. 64, Civil Action No. 10-2673, Doc. No. 43. After exhausting state court remedies, Cox filed a counseled supplemental memorandum in support of his August 5, 2013 Rule 60(b)(6) motion. Doc. Nos. 91, 95. The respondents filed a response to the motion on November 27, 2017. Doc. No. 105. Finally, Cox filed a counseled reply on February 9, 2018. Doc. No. 110. Cox's June 20, 2012 Rule 60(b)(6) motion, on remand from the Third Circuit, and August 5, 2013 Rule 60(b)(6) motion are now ripe for review.

## II. DISCUSSION

### A. Standards Of Review

#### 1. Rule 60(b)(6)

Rule 60(b) of the Federal Rules of Civil Procedure provides that a party may file a motion seeking relief from "a final judgment, order, or proceeding" for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;
(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
(4) the judgment is void;
(5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
(6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).  "A motion under Rule 60(b) must be made within a reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding."  Fed. R. Civ. P. 60(c)(1).

A Rule 60(b)(6) movant must show "extraordinary circumstances where, without such relief, an extreme and unexpected hardship would occur."  *Cox II*, 757 F.3d at 115 (quoting *Sawka v. Healtheast, Inc.*, 989 F.2d 138, 140 (3d Cir. 1993)).  Courts in this circuit employ

> a flexible, multifactor approach to Rule 60(b)(6) motions, including those built upon a post-judgment change in the law, that takes into account all the particulars of a movant's case. *See Coltec Indus., Inc. v. Hobgood*, 280 F.3d 262, 274 (3d Cir. 2002) (noting, in the context of a 60(b)(6) analysis, the propriety of "explicit[ly]" considering "equitable factors" in addition to a change in law); *Lasky v. Cont'l Prods. Corp.*, 804 F.2d 250, 256 (3d Cir. 1986) (citing multiple factors a district court may consider in assessing a motion under 60(b)(6)). The fundamental point of 60(b) is that it provides "a grand reservoir of equitable power to do justice in a particular case." *Hall v. Cmty. Mental Health Ctr.*, 772 F.2d 42, 46 (3d Cir. 1985) (internal quotation marks omitted).

*Id.* at 122 (footnote omitted).

### 2. The Relationship Between Rule 60(b) Motions and Second or Successive Habeas Corpus Applications

"When a motion is filed in a habeas case under a Rule 60(b) . . . label, the district court must initially determine whether the motion is actually a 'second or successive' habeas petition within the meaning of [28 U.S.C.] § 2244(b)."  *Davenport v. Brooks*, Civil Action No. 06-5070, 2014 WL 1413943, at *3 (E.D. Pa. Apr. 14, 2014).  Pursuant to section 2244(b),

> [a] claim presented in a second or successive habeas corpus application under [28 U.S.C. §2254] that was not presented in a prior application shall be dismissed unless . . .
>
> > **(A)** the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > **(B)(i)** the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

> **(ii)** the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2). "Before a second or successive application . . . is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application." § 2244(b)(3)(A). Failure to seek appellate authorization before filing a successive petition acts as a jurisdictional bar. *See Blystone v. Horn*, 664 F.3d 397, 412 (3d Cir. 2011) ("A petitioner's failure to seek such authorization from the appropriate appellate court before filing a second or successive habeas petition 'acts as a jurisdictional bar.'" (quoting *United States v. Key*, 205 F.3d 773, 774 (5th Cir. 2000))).

If a petitioner in a section 2254 habeas proceeding files a motion containing a "claim," even if he labels it as a Rule 60(b) motion for relief, the motion is in substance a second or successive habeas corpus application. *See Gonzalez v. Crosby*, 545 U.S. 524, 531 (2005) (concluding that Rule 60(b) motions containing "claims," "is in substance a successive habeas petition"). Accordingly, the motion is subject to section 2244(b)'s aforementioned requirements, including appellate authorization. *Id.* A "claim" under section 2244(b), is "an asserted federal basis for relief from a state court's judgment of conviction." *Id.* at 530. A Rule 60(b) motion does not assert a claim when it "attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings." *Id.* at 532. Examples of non-merits rulings include those denying habeas relief for failure to exhaust, procedural default, or a statute-of-limitations bar. *Id.* at 532 n.4. However, a Rule 60(b) motion asserts a claim

> if it attacks the federal court's previous resolution of a claim *on the merits*, . . . since alleging that the court erred in denying habeas relief on the merits is

effectively indistinguishable from alleging that the movant is, under the substantive provisions of the statutes, entitled to habeas relief.

*Id.* at 532 (emphasis in original).

### 3.    Ineffective Assistance of Counsel

With regard to claims of ineffective assistance of counsel, a petitioner must satisfy the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, the petitioner must show that counsel's representation was deficient because it was not "within the range of competence demanded of attorneys in criminal cases." *Id.* at 688. That is, the petitioner must demonstrate that counsel's representation fell below an "objective standard of reasonableness" based on the facts and circumstances present at the time of counsel's allegedly deficient conduct. *Id.* In attempting to satisfy this burden, a petitioner has to overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689.

As for the second element of the *Strickland* test, a petitioner must demonstrate prejudice. *Id.* at 687. To demonstrate prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

### B.    Analysis

In vacating the May 23, 2013 order denying Cox's June 20, 2012 Rule 60(b)(6) motion and remanding to this court, the *Cox II* court offered instructions for further review of Cox's motion. 757 F.3d at 124. First, as discussed above, the court held that "the jurisprudential change rendered by *Martinez*, without more, does not entitle a habeas petitioner to Rule 60(b)(6)

relief." *Id.* Second, because the *Martinez* exception to procedural default requires a "substantial" underlying ineffective assistance of trial counsel ("IATC") claim, the court may assess the merits of Cox's procedurally defaulted IATC claims. *Id.* at 124–25. Third, in the habeas context, Rule 60(b)(6) relief must be "rare," the principle of comity weighs against disturbing a state's criminal judgment via a Rule 60(b) motion, and "[c]onsiderations of repose and finality become stronger the longer a decision has been settled." *Id.* at 125 (citations omitted). Fourth, "[a] movant's diligence in pursuing review of his [IATC] claims is also an important factor." *Id.* at 126. Finally, the fact that Cox's conviction in the Davis murder case served as an aggravating factor for his receiving a death sentence in the Stewart murder case is "significant." *Id.*

Cox presents another factor that he argues weighs towards a finding of "extraordinary circumstances" that was not before the Third Circuit when that court issued the aforementioned guidance: the new ballistics report. Before considering the Third Circuit's instructed factors, the court first analyzes the importance of the new ballistics report as it is a prerequisite to a complete discussion of the *Cox II* factors.

### 1. The New Ballistics Report as an Extraordinary Circumstance

Rather than providing a substantive ground for habeas relief, Cox argues that the new ballistics report is an extraordinary circumstance undermining the prosecution's evidence, thereby permitting a merits consideration of his defaulted IATC claims. Pet'r's Reply Supp. Mot. Relief Final J. Pursuant Fed. R. Civ. P. 60(b)(6) ("Pet'r's Reply") at 3, Doc. No. 110. The court cannot agree because (1) his motion, to the extent it is based on the new ballistics report, is a second or successive habeas corpus petition requiring appellate authorization; (2) his motion, again to the extent it is based on the new ballistics report, is untimely whether construed under

Rules 60(b)(2) or 60(b)(6); and (3) regardless of non-merits defects, the report does not undermine Cox's conviction.

a.     <u>Second or Successive Petition</u>

Cox's Rule 60(b) motion requesting relief based on the new ballistics report is a second or successive habeas petition because the report attacks the merits of his conviction, not the court's prior refusal to consider procedurally defaulted IATC claims.

As an initial matter, courts have repeatedly held that new evidence presented in a Rule 60(b) motion, such as the new ballistics report, constitutes a "claim" under *Gonzalez*. *See Blystone*, 664 F.3d at 413 ("[A] motion that seeks to present newly discovered evidence in support of a claim previously denied presents a claim." (citing *Gonzalez*, 545 U.S. at 532)); *United States v. Jones*, Crim. Action No. 06-367, 2015 WL 525184, at *8 (E.D. Pa. Feb. 9, 2015) ("A Rule 60(b) motion that brings a new claim for relief or new evidence in support of a claim is in substance a successive habeas petition and should be treated accordingly." (citing *Gonzalez*, 545 U.S. at 531)).

Cox's own mismatched reasons for raising the ballistics report further demonstrate that presentation of the report constitutes a claim under *Gonzalez*. On the one hand, he rejects the idea that the new ballistics report raises a new claim, and reaffirms that he only raises procedurally defaulted IATC claims in his Rule 60(b)(6) motion. Pet'r's Reply at 2–3. On the other hand, he calls the ballistics report "an extraordinary circumstance that calls into question the accuracy and reliability of the prosecution's evidence against [him]." *Id.* at 3 (citing *Cox I* for its reliance on "ballistics evidence presented at trial to conclude that Petitioner was not prejudiced by trial counsel's deficient performance"). Thus, according to Cox, for the report to have any bearing on this court's determination as to whether extraordinary circumstances exist,

thereby permitting consideration of the procedurally defaulted IATC claims, the court must first determine whether the report does indeed "call[] into question the accuracy and reliability of the prosecution's evidence."

Unfortunately, determining the accuracy and reliability of the prosecution's evidence is a fundamentally merits-based analysis and goes beyond the purview of a Rule 60(b)(6) motion, as delineated by *Gonzalez*. Cox fails to demonstrate how the new ballistics report, unlike his *Martinez* claim, has any bearing on the order from which he seeks relief, at least to the extent that the order denied habeas relief on procedural default grounds. Cox does not wield the new ballistics report to attack "some defect in the integrity" of that order's conclusion that all but one of his IATC claims were procedurally defaulted. *Gonzalez*, 545 U.S. at 532. Instead, by his own admission, the new ballistics report demonstrates flaws in trial evidence, and therefore amounts to a claim under *Gonzalez*—*i.e.* "an asserted federal basis for relief from a state court's judgment of conviction." *Id.* at 530. In other words, he "seek[s] to challenge the underlying criminal proceedings and not this Court's decision denying habeas relief. In this regard, the motion . . . is properly construed as a second or successive habeas petition." *Box v. Petsock*, Civ. Action No. 3:86-CV-1704, 2014 WL 4093248, at \*15 (M.D. Pa. Aug. 18, 2014) (holding that petitioner's allegations of fraud perpetrated on state courts and claims of new evidence, including alleged "sham" arrest warrant, constituted second or successive petition, even though joined to Rule 60(b) motion for relief based on *Martinez* as an extraordinary circumstance).

Cox's citation to *Cox I* only supports the conclusion that his Rule 60(b) motion, to the extent it presents the new ballistics report, is a second or successive petition. He cites that case to demonstrate that the new report undermines the Third Circuit's reliance on purportedly outdated ballistics evidence in its analysis of the one IATC claim considered on its merits. But

the ostensible purpose of Cox's Rule 60(b)(6) motion is not to relitigate the merits of his one IATC claim that was not procedurally defaulted. Rather, he seeks a merits-based consideration of IATC claims previously rejected for a non-merits reason: procedural default. If Cox were to use the new ballistics report to challenge his one IATC claim that was not procedurally defaulted, that would constitute an attack of "the federal court's previous resolution of a claim *on the merits*." *Gonzalez*, 545 U.S. at 532 (emphasis in original). Such a challenge would amount to a second or successive petition.

Finally, the court does not interpret *Cox II* as an invitation for Cox to present new evidence, new IATC claims, or any other arguments irrelevant to the propriety of reopening his procedurally defaulted claims—the narrow basis under which the Third Circuit remanded to this court for review. Rule 60(b)(6)'s requirement that the movant demonstrate "extraordinary circumstances" in the habeas context does not unlock for the court's consideration any of a petitioner's conceivable disagreements with his conviction or collateral proceedings. In short, Cox's Rule 60(b) attacks must be tailored to the order from which he seeks relief, and he has not explained how the new ballistics report demonstrates that this court erred in declining to review his procedurally defaulted IATC claims. Therefore, his Rule 60(b)(6) motion for relief based on the new ballistics report is a second or successive petition, and because he did not first seek authorization from the Third Circuit, this court lacks jurisdiction over that claim.[6]

---

[6] Cox also urges the court to consider additional IATC claims separate from those raised in his federal habeas petition as extraordinary circumstances that support *Martinez* relief: trial counsel's failure to retain a ballistics expert, call witnesses whose statements to police implicated others in the crime, and cross-examine the Little sisters on inconsistencies in their testimony. For the same reasons that Cox's presentation of the new ballistics report constitutes a second or successive petition, these purported extraordinary circumstances are also second or successive claims.

b.    Timeliness of the New Ballistics Report

*Gonzalez* concerns aside, Cox's motion for relief based on the new ballistics report is also untimely, whether the court construes his motion as requesting relief under Rule 60(b)(2) or 60(b)(6).[7] The court analyzes timeliness under each rule in turn.

i.    Rule 60(b)(2)

Rule 60(b)(2) permits relief from a final judgment, order, or proceeding based on "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b) . . . ." Fed. R. Civ. P. 60(b)(2). Under this Rule, "the phrase newly discovered evidence refers to evidence of facts in existence at the time of trial of which the aggrieved party was excusably ignorant." *United States v. 27.93 Acres of Land, More or Less, Situate in Cumberland Cty., Com. of Pa. Tract No. 364-07*, 924 F.2d 506, 516 (3d Cir. 1991) (internal brackets omitted). Relief under Rule 60(b)(2) and Rule 60(b)(6) is mutually exclusive; that is, if relief is available under Rule 60(b)(2), it is unavailable under Rule 60(b)(6). *See S.E.C. v. Fin. Warfare Club, Inc.*, 425 F. App'x 85, 87 (3d Cir. 2011) (per curiam) (citing *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988)). Accordingly, "Rule 60(b)(6) cannot be used as a means by which the [one-year] time limitations of 60(b)(1–3) may be circumvented." *Salley v. Dragovich*, 594 F. App'x 56, 58 (3d Cir. 2014) (per curiam) (internal quotation marks omitted). Thus, in *Financial Warfare Club, Inc.*, the Third Circuit foreclosed Rule 60(b)(6) relief because the appellant presented newly discovered evidence that the appellee committed fraud, making Rule 60(b)(2) or (3) relief available. *See* 425 F. App'x at 87. This was so even though the appellant did not specifically file his motion for relief under Rules 60(b)(2) or (3). *See id.* at 86–87.

---

[7] Cox's Rule 60(b)(6) motion is only untimely to the extent it requests relief based on the new ballistics report. As the *Cox II* court noted, his Rule 60(b)(6) motion is timely to the extent it requests relief pursuant to *Martinez* and consideration of his procedurally defaulted IATC claims. *Cox II*, 757 F.3d at 116.

The *Financial Warfare Club, Inc.* logic and application of precedent applies similarly to this case. By Cox's own telling, the new ballistics report presents factual evidence that existed at the time of trial in 1993 that he could not discover with reasonable diligence, and for which he was excusably ignorant, because the respondents always maintained exclusive control of ballistics evidence:

> [T]he delay in bringing this motion is the result of Respondent's exclusive possession of the ballistics evidence at issue. Respondent has always maintained complete control of the disputed ballistics evidence. Respondent only re-analyzed the evidence and produced a new and materially different report after Respondent was ordered to allow Petitioner access to the ballistics evidence. The grand reservoir of equitable power to do justice in a particular case under [R]ule 60(b) counsels against now punishing Mr. Cox for a delay that was of the Respondent's making.

Pet'r's Reply at 4 (citation and quotation marks omitted). Because the new ballistics report constitutes newly discovered evidence, Rule 60(b)(2) relief is available, subject to Rule 60(c)(1)'s one-year deadline. Judge Brody denied Cox's petition for a writ of habeas corpus on August 11, 2004, and Cox did not file his motion for relief based on the new ballistics evidence until August 5, 2013, far past the one-year deadline. Therefore, Cox's motion for relief, to the extent the new ballistics report is the basis for that relief, is untimely.

## ii.     Rule 60(b)(6)

Even if the court could consider Cox's motion under Rule 60(b)(6), the result is no different because his lack of diligence in seeking ballistics evidence belies his filing the motion within a reasonable time. A Rule 60(b)(6) motion "must be made within a reasonable time," Fed. R. Civ. P. 60(c)(1), and, here, Cox did not move for Rule 60(b)(6) relief "within a reasonable time" because he did not diligently seek ballistics evidence, contrary to his assertion above. The Supreme Court of Pennsylvania considered this very issue in 2016 upon review of Cox's PCRA petition based on the new ballistics report. *See Commonwealth v. Cox*, 146 A.3d

221, 231 (Pa. 2016). Although that PCRA petition was based on the Watson and Stewart

murders, the Court's analysis is relevant to the Davis murder as well:

> [T]here is no question that Cox knew that more testing could be performed on the ballistics evidence at the time of trial [for the Watson and Stewart murders] in 1995. It was not until six years later, in 2001, that Cox first attempted to obtain the ballistics evidence through his first PCRA petition . . . . By raising this claim in his first PCRA petition, Cox has effectively conceded that the testing could have been done at the time of trial. Moreover, Cox admitted to committing the Davis murder, and so Cox always knew that more than one firearm was used in the perpetration of that crime. Nevertheless, Cox has never explained why he did not seek independent ballistics testing at the time of trial or on direct appeal. Importantly, our review of the record reveals that Cox has never alleged that he asked trial counsel to seek independent ballistics testing or that his counsel refused such a request. Were that the situation, there could be a basis upon which to conclude that he attempted to act diligently, but that his efforts were thwarted by trial counsel. However, this is simply not the case here. Cox acknowledges that the testing could have been done at the time of trial, but offers no explanation as to why he did not seek such testing at that time. Instead, he took no action to obtain the additional testing for six years. . . . It is this lengthy, unexplained delay that defeats the possibility of a conclusion that Cox acted with reasonable effort to obtain ballistics testing. . . . Cox's failure to act, and failure to explain his lack of action, precludes a finding of due diligence.

*Id.* (citation omitted). The Court also clarified in a footnote that

> [t]here is no allegation here that a newly developed technology or newly discovered source led to the new fact. Cox makes no claim that Officers Walker and Cruz[, the examiners for the new ballistics report,] employed new testing methods or techniques, nor does he claim that they tested anything beyond what Officer O'Hara[, the examiner for the old ballistics report,] tested in connection with his report. This further weakens any attempt to claim that the fact was not ascertainable prior to the issuance of the second ballistics report.

*Id.* at 231 n.15. None of the relevant factors that the Court discussed is materially different in

this case. Moreover, the Court's reasoning applies even more forcefully here because the Davis

murder trial occurred two years before the Watson and Stewart murder trial. Therefore, eight

years, rather than six years, separate Cox's trial in this case and his first attempt to obtain

ballistics evidence in any of the three cases.

Cox's argument that the Commonwealth has always been in sole possession of the ballistics evidence is only superficially persuasive. As the Court discussed, Cox was admittedly present for Davis's murder, and therefore, assuming the accuracy of the new ballistics report's conclusion, he has always known that the bullets recovered from Davis originated from two (or more) guns. Despite that knowledge, there is no evidence he insisted that his trial or PCRA counsel pursue a theory based on multiple firearms, which surely would have involved seeking another ballistics analysis. Without such diligence, the court refuses to find that he filed his Rule 60(b)(6) motion based on the new ballistics report within a reasonable time.

      d.        <u>Whether the New Ballistics Report's Conclusion is Extraordinary</u>

Even disregarding *Gonzalez*, timeliness, and diligence concerns, the new ballistics report does not undermine the reliability of Cox's conviction because he admitted to firing two shoots that were almost certainly not accidental. Therefore, the report is not an extraordinary circumstance.

Most importantly, while the new ballistics report, if accurate, undermines the conclusion that Cox was the only shooter, it does not undermine the conclusion that he nevertheless shot intentionally. Regardless of whether the bullets recovered from Davis originated from one or two guns, Cox admitted to firing two shots in his statement. Because at least three bullets struck Davis, the new ballistics report is still consistent with Cox firing two shots with at least one other shot originating from a different shooter. Concededly, Cox firing only two shots is more suggestive of an accident than firing three or more shots. But only marginally so: The ballistics expert testified that two shots were sufficient to all but negate the possibility of an accident. Specifically, the ballistics expert at trial testified that two or more shots required the shooter to cock the hammer and/or pull a double action trigger for each shot. The ballistics expert also

testified that these actions between each shot were especially necessary given the likelihood that the bullets recovered from Davis originated from a revolver. Thus, even if Cox only fired twice, instead of three or more times, he still would have had to undertake the intentional action of preparing the gun for the second shot. The combination of these three pieces of evidence—Cox's admission, evidence that at least three bullets struck Davis, and the ballistics testimony—demonstrate the extreme unlikelihood that Cox accidentally shot Davis.

According to Cox, as a result of the new ballistics report, his "partially-inculpatory statement is called into doubt and the portion of his statement explaining that the shooting was accidental is supported." Pet'r's Reply at 9. The court disagrees for several reasons, each contributing to the court's conclusion that the new ballistics report is not an extraordinary circumstance. First, the new ballistics report does not impeach the medical examiner's testimony that Davis had four wounds caused by at least three bullets. Therefore, assuming *arguendo* that the conclusion of the new ballistics report is correct, the report is consistent with Cox's admission that he fired two shots, and that there was at least one shot from a different firearm. Second, he never explains why he should not be held responsible for his own admission, given that the new report is consistent with two (or more) shots originating from his own firearm.[8] Third, it is unclear whether Cox even argued the shooting was an accident in his admission. In recollecting the moment of the shooting, the only indication of an accident is his reference to Lee handing him a cocked gun, after which he twice states that he fired two shots. But as explained, even if Lee handed him a cocked gun, Cox would have still had to cock the gun for the second

---

[8] Before trial, Cox moved to suppress his statement based on a purported unawareness that he could face the death penalty for confessing—not, for example, involuntariness or coercion. In denying the motion, the trial judge, finding that the statement was not involuntary, explained, "I find there's absolutely no evidence nor has the defendant presented any argument on the issue of psychological coercion." Trial Tr. Oct. 27, 1993, at 63.

shot. Outside of that moment, Cox only states that he told his family he shot someone accidentally and quotes Lee stating that the police would not look at the shooting as an accident.

Fourth, to the extent the new ballistics report demonstrates that Cox's statement omitted a complete description of Davis's death, Cox alone is responsible for that omission, further undermining his attempt to paint the shooting as an accident. Cox was present at the time of Davis's shooting, and the medical examiner testified that all bullets entered from the same approximate angle. Cox would therefore know if somebody else fired shots. Nevertheless, he never suggested the involvement of a second shooter. Assuming the accuracy of the new report, the court is unwilling to find credible Cox's claims of accident thereby rewarding him for hiding the full truth of the shooting. And finally, Cox ignores the fact that the first ballistics report was merely inconclusive as to whether the bullets recovered from Davis originated from the same firearm. Thus, Cox's conviction was not necessarily premised upon him firing all shots, belying his argument that the new report is a game-changer that materially strengthens his assertion that he shot accidentally.

Cox is correct that the new report offers a different interpretation of the proceedings and evidence at trial, as well as collateral proceedings. For example, the court agrees with Cox that the report "places both the prosecution and defense theories in a different light." Pet'r's Suppl. Mem." at 10, 13 (citing Trial Tr. Oct. 28, 1993, at 116 (reciting trial counsel's statement during closing that "I don't know that we could say firing a gun three times . . . would be consistent with an accident"), 124 (reciting prosecutor's closing statement that trial "[c]ounsel has conceded . . . there is one shooter and that shooter is the defendant, and that defendant is responsible for all the bullets that entered the body of the deceased")). Additionally, both the 2003 R & R and *Cox I* do not appear to contemplate the possibility of a second firearm or

shooter in determining that trial counsel's deficient performance did not prejudice Cox. For example, Magistrate Judge Jacob Hart wrote in the 2003 R & R, "Since Dr. Lieberman concluded that the wounds were caused by at least three bullets, even if the weapon was cocked when Cox got it, he would have had to cock the weapon two other times to fire three shots." R & R at 19, Doc. No. 31. Likewise, the *Cox I* court explained:

> According to Cox, the Superior Court disregarded the importance of Kimberly Little's testimony to the prosecution's case and gave too much weight to other, wholly circumstantial, evidence presented at trial. However, even without Kimberly Little's testimony, the verdict was supported by circumstantial evidence. For example, Cox admitted to police that he shot the victim from a distance of two feet, and the victim sustained three gun shot wounds to vital parts of the body, specifically the neck and chest. In addition, the ballistics expert explained that the likelihood of an accidental shooting was diminished by the number of shots fired. It is true that the ballistics expert testified that he could not exclude the possibility of an accidental shooting without examining the weapon; nonetheless, the expert's testimony about the likelihood of an accidental shooting weighs against Cox's claim that he shot the victim accidentally.

174 F. App'x at 88. And finally, the report's conclusion contradicts Kimberly Little's eyewitness testimony which omits any reference to a second shooter or firearm.

Even if the new ballistics report offers this new interpretation of trial and collateral proceedings, it does not necessarily follow that the outcome of those proceedings is faulty. First, closing statements suggesting that Cox fired three shots and fired them alone are immaterial because, as explained above, the admitted two shots sufficiently established intent, and the presence of a second shooter is irrelevant to that intent. And again, these arguments ignore the fact that the first ballistics report was only inconclusive as to whether both bullets originated from the same gun. Second, although Judge Hart relied on Cox having to cock the gun two other times to establish that trial counsel's deficient performance did not prejudice Cox, just one cock of the gun demonstrates the same point with near equal force, as explained by the ballistics expert. The same goes for the *Cox I* reasoning: One fewer shot than that presumed by the court

still demonstrates Cox's intent because he still had to cock the gun for the second shot to which he confessed. Lastly, although the new ballistics report's conclusion contradicts Kimberly Little's account of the shooting, her testimony is unnecessary to maintain confidence in the outcome of Cox's trial, as the Third Circuit determined, even assuming Cox fired only two shots rather than three or more.

In all, even overlooking Cox's improper presentation of the new ballistics report in a Rule 60(b)(6) motion and the untimeliness of the motion, the report is not an extraordinary circumstance because (1) the existing evidence—Cox's admission that he shot twice, medical testimony that at least three bullets struck Davis, and ballistics testimony that shooting twice all but forecloses an accident—sufficiently justifies his conviction; (2) Cox fails to explain why he is not responsible for his own inculpatory statement that he shot twice, how his original statement demonstrates he thought the shooting was an accident, why he has kept silent about the possibility of a second shooter despite his presence during the shooting, and why the new report materially changes the integrity of the trial when the ballistics evidence at trial was merely inconclusive as to the number of firearms; and (3) although Cox is correct that the new report undercuts presuppositions during and after trial that he was responsible for all shots, the new report nevertheless does not undercut the *outcomes* of trial and collateral proceedings.

### 2.  Merit and Substantiality of the Procedurally Defaulted IATC Claims

Because the *Martinez* exception to procedural default requires a "substantial" underlying IATC claim, the *Cox II* court permitted an assessment of the merits of Cox's defaulted IATC claims on remand. The defaulted IATC claims are four-fold: (1) failure to introduce evidence that the Little sisters were related to Davis; (2) failure to impeach Kimberly Little with prior inconsistent statements; (3) failure to refute the Commonwealth's assertion that Cox worked as a

drug lookout; and (4) failure to present an adequate defense to first-degree murder and properly advise Cox of his right to testify. *See* R & R at 3, 9–13; Pet'r's Suppl. Mem. at 14. The court discusses the merit of each in turn and finds that Cox fails to prove any of his IATC claims.

     a.     <u>Failure to Introduce Evidence that the Little Sisters were Related to Davis</u>

Cox argues that trial counsel possessed a statement from Mary Little's husband, Keith Harris ("Harris"), indicating that Harris was Davis's cousin by marriage, thereby making the Little sisters cousins of Davis; however, trial counsel failed to question the biases of the Littles based on that familial relationship. Pet'r's Suppl. Mem. at 19. The court disagrees that trial counsel's performance was deficient or that the alleged deficiency prejudices Cox.

Under the first part of the *Strickland* test, trial counsel's performance was not deficient because Harris's statement is ambiguous as to the familial relationship between Davis and the Littles. Harris stated he was related to Davis as a "cousin by marriage." Pet'r's Suppl. Mem., Ex. B at 2, Doc. No. 95-2. As the respondents argue, while the Littles may be cousins of Davis, Davis may also have been married to Harris's cousin. Resp. Suppl. Mem. Supp. Pet'r's Mot. Relief Final J. Pursuant Fed. R. Civ. P. 60(b)(6) ("Resp't's Resp.") at 28, Doc. No. 105. Cox fails to respond with any evidence of a relevant familial relationship, and without clarity on that question, trial counsel's performance did not fall below an objective standard of reasonableness.

Nor would any deficiency be prejudicial, under the second part of the *Strickland* test. As the Third Circuit explained in *Cox I*, sufficient evidence outside of the Little sisters' testimony existed to convict Cox, and as explained above, even if considering the new ballistics report is proper, the report does not materially alter the *Cox I* reasoning. Therefore, there is not a reasonable probability that trial counsel's failure to elicit testimony from the Littles on a possible familial relationship to Davis prejudiced Cox.

b.      <u>Failure to Impeach Kimberly Little with Prior Inconsistent Statements</u>

Cox alleges that trial counsel failed to highlight two prior inconsistent statements of Kimberly Little.  First, Cox argues that a passage in Harris's statement demonstrates that Kimberly Little did not see the shooting, contrary to her testimony that she witnessed the shooting from her apartment window.  Pet'r's Suppl. Mem. at 18; Pet'r's Reply at 14.  The complete relevant portion of Harris's statement is as follows:

> Q. Did anyone else tell you that they had seen the shooting?
> A. Kim said that she was ac[]ross the street and after she heard the shots she went to the corner and seen them . . . pulling off."
> Q. Anyone else?
> A. That was it.

Pet'r's Suppl. Mem., Ex. B at 3–4.  According to Cox,

> [t]he key part of this statement . . . is that Ms. Little did not see the incident. Instead, she only *heard* the shots. Moreover, Mr. Harris stated that he was in the apartment building, where both he and Ms. Little lived, when the shooting happened. There is a reasonable inference that Mr. Harris would not have said his sister-in-law was "across the street" if she was inside the apartment building that they both lived in. By calling Mr. Harris as a witness, counsel could have proved that Kimberly Little was not where she claimed to be when the shooting occurred and did not see Petitioner shoot anyone.

Pet'r's Reply at 14 (emphasis in original).

Cox's argument takes advantage of two ambiguities in Harris's statement.  First, while Harris's answer responds to the question of whether anyone else told him that they had "seen the shooting," suggesting that Kimberly Little saw the shooting, he also says that she had "seen them" "after she heard the shots," suggesting that the first time that she saw the perpetrators was after the shooting.  Second, although Harris and Kimberly Little lived in the same building, and Kimberly Little testified that she viewed the shooting from her building, he said she was "across the street" at the time of the shooting, which could either mean she was across the street from Harris, an inconsistency, or across the street from the shooting, a consistency.

While neither interpretation of Harris's statement strikes the court as more likely than the other, effective counsel would have nonetheless further investigated Harris's meaning. However, Cox does not allege a failure to investigate; rather, from this sole ambiguous statement, he faults trial counsel for failing to use the statement to impeach Kimberly Little at trial. Without more evidence of deficiency—for example, that trial counsel failed to use the statement either after neglecting to investigate or after an investigation affirmed Cox's interpretation of Harris's statement—the court cannot find that trial counsel's failure to impeach Kimberly Little with Harris's statement was objectively unsound trial strategy.

The second inconsistency Cox alleges is as follows: Kimberly Little told police that she had known Cox for a week, and yet she testified that he was a lookout for a drug operation that was open every day except Sunday. Pet'r's Suppl. Mem. at 18. Additionally, trial counsel failed to question Little about the source of her drug operation information. Neither alleged failure demonstrates that trial counsel's representation fell below an objective standard of reasonableness. Kimberly Little's familiarity with the weekly schedule of a local drug operation is consistent with only knowing one of the drug operation's participants for one week. Additionally, questioning Little about the source of her information may have only elicited further unfavorable testimony about Cox's involvement. Therefore, Cox cannot overcome the strong presumption that trial counsel's omissions during his cross-examination of Kimberly Little were sound trial strategy. Trial counsel's performance was not deficient on either alleged prior inconsistent statement.

As for the prejudice prong of *Strickland*, because Cox argues in this IATC claim that trial counsel missed an opportunity to impeach Kimberly Little, the same analysis from the first claim

applies: Kimberly Little's testimony was unnecessary to support Cox's conviction, and therefore, the failure to impeach her did not prejudice him.

c.     Failure to Refute the Commonwealth's Assertion that Cox Worked as a Drug Lookout

In his third defaulted IATC claim, Cox argues that trial counsel failed to conduct an adequate investigation and interview and produce exculpatory witnesses to defend him from the accusation that he worked as a drug lookout. For example, trial counsel had an available witness willing to testify about Cox's lawful employment. Under the first prong of *Strickland*, evidence of Cox's lawful employment is of marginal probative value because lawful and unlawful employment are not mutually exclusive. That probative value is small enough that it was not objectively unreasonable for trial counsel to decline to elicit testimony of lawful employment. It is true that trial counsel "wasn't really . . . anticipating" that the Commonwealth would produce testimony from Kimberly Little as to Cox's drug work. Trial Tr. Oct. 28, 1993, at 5. However, Cox fails to offer any specifics, other than evidence of lawful employment, as to what trial counsel should have done differently at trial to contradict Kimberly Little's testimony of Cox's work as a drug lookout. Therefore, Cox has failed to demonstrate that trial counsel's performance was deficient on this issue.

Turning to the prejudice prong of *Strickland*, evidence that Cox worked as a drug lookout was unnecessary for the reasons discussed in the above analysis of the new ballistics evidence. Regardless of his alleged work as a drug lookout, Cox confessed to shooting Davis twice, the ballistics examiner testified as to the extreme unlikelihood that two shots could be accidental, and the medical examiner testified that Davis died from at least three gunshot wounds. Therefore, trial counsel's failure to refute the assertion that Cox worked as a drug lookout did not prejudice him.

d.      Failure to Present an Adequate Defense to First-Degree Murder and Properly Advise Cox of His Right to Testify

On the final procedurally defaulted IATC claim, Cox argues that trial counsel failed to (1) present any evidence that he shot accidentally and (2) properly advise him of his right to testify. As to the first alleged deficiency, trial counsel proceeded at trial under a theory that Cox had "buckshot fever,"[9] and Cox repeatedly criticizes this decision in his submissions. *See, e.g.*, Pet'r's Suppl. Mem. at 2, 16 (referring to theory as "ill-conceived" and "irrational"). The court sees this IATC claim differently: Trial counsel pursued the buckshot fever theory because Cox's inculpatory admission that he shot twice left him without winning options. While admittedly lacking in plausibility, the buckshot fever theory provided a tidy explanation for how Cox could have fired two or more shots without the intent to kill. Once again, Cox does not specify which theory trial counsel should have instead pursued, which arguably further demonstrates the difficulty of framing two or more shots as an accident.

Worse, and turning to the second alleged deficiency, Cox's only support for the argument that trial counsel failed to properly advise him of his right to testify is a misleadingly decontextualized quote from trial counsel during a PCRA hearing. Cox argues:

> At the PCRA hearing, trial counsel testified that "there were many factors that led me to believe [the statement] could have been coerced." NT 2/04/98 at 5. Given counsel's admission that he did not believe the statement, he was ineffective for failing to advise Mr. Cox of his right to testify . . . .

Pet'r's Reply at 17 (alteration in original). In fact, trial counsel's fully contextualized quote from the PCRA hearing is as follows:

> Q.      Would you agree that Mr. Cox's statement, in your view, did not make out first degree murder?

---

[9] As described by trial counsel, buckshot fever is "a collective term describing various individual incidents of strange and relatively unexplainable behavior . . . in hunters, shooting into the ground, shooting more shots than they ever realized, having an empty weapon, [and] thinking they only shot once . . . [.]" Trial Tr. Oct. 28, 1993, at 65.

A.      That's correct. I knew the Commonwealth would be using his statement, and I did not attempt to suppress it.  First of all, it was not suppressible in the sense that there were many factors that led me to believe it could have been coerced, but having the statement in, knowing full well that the statement was going to be brought into evidence, my strategy was to attempt to use the good points of that statement to greatest advantage.

Hr'g Tr., Feb. 4, 1998, at 6.  In other words, trial counsel's testimony was the opposite of that suggested by Cox, which deflates any argument that trial counsel should have encouraged him to testify to combat a coerced statement.  Therefore, Cox has failed to prove that trial counsel's first-degree murder defense and right-to-testify advisement were deficient.

On this claim, the court declines to consider the prejudice prong of *Strickland* because Cox fails to offer alternatives to trial counsel's strategy that would permit the court to contemplate the consequences of those alternatives.  *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one.").

     e.      Cumulative Effect and Consequence of Unsuccessful Claims under *Martinez*

Because Cox has failed to demonstrate that any of his claims are meritorious, the aggregate of his claims do not amount to a more favorable outcome.  Additionally, to round out the application of Cox's case to the *Martinez* rule, the fact that his defaulted IATC claims are not meritorious, let alone "substantial," PCRA counsel was not deficient for abandoning those claims; nor did the abandonment prejudice Cox.  Because *Martinez* served as the foundation of Cox's argument for relief, the rejection of his defaulted IATC claims is sufficient to dispose of his Rule 60(b)(6) motion.  Nevertheless, the court completes its analysis by discussing the remaining *Cox II* considerations and any additional factors that Cox presents.

### 3. Rarity of Rule 60(b)(6) Relief and Principles of Comity and Finality

The rarity of Rule 60(b)(6) relief, comity, and finality all weigh against finding that extraordinary circumstances exist here, such that without relief, Cox would suffer an extreme and unexpected hardship. Given the lack of merit of his defaulted IATC claims and the fact that *Martinez* alone does not constitute extraordinary circumstances, granting Cox's motion would conflict with mandatory authority requiring only rare grants of Rule 60(b)(6) relief. Principles of comity and finality also weigh against granting relief because the state court convicted Cox 25 years ago, and, as the *Cox II* court indicated, the district court initially dismissed his federal habeas petition in 2004, 14 years ago and eight years before *Martinez*. Therefore, considerations of repose and finality, which strengthen over time, weigh against granting Cox relief.

### 4. Cox's Diligence in Pursuing His Defaulted IATC Claims

Unlike the previous discussion of Cox's diligence in pursuing ballistics evidence, the focus here is on Cox's diligence in pursuing review of his defaulted IATC claims. Cox summarizes his long-running pursuit of the defaulted IATC claims as follows:

> [Cox] initially raised these claims in a *pro se* Allocatur Petition filed on June 30, 1995. After allocatur was denied, Petitioner raised the claims in a *pro se* PCRA petition. At the evidentiary hearing, Mr. Cox did not consent to waive the claims that his post-conviction counsel abandoned. In fact, he submitted a second *pro se* PCRA petition to raise these claims after the first PCRA petition was denied. In sum, Mr. Cox tried unsuccessfully to present the claims in a *pro se* petition for allowance of appeal in his direct appeal, in a counseled PCRA petition, and in a *pro se* PCRA petition.

Pet'r's Suppl. Mem. at 23. The respondents appear to concede that Cox has diligently pursued his procedurally defaulted IATC claims. *See* Resp't's Resp. at 32 (listing defaulted claims and acknowledging that "petitioner was diligent in pursuing these claims"). The court agrees that Cox has diligently pursued his defaulted IATC claims, and his diligence would weigh towards granting relief if the underlying claims had substantial merit.

## 5. Cox's Conviction Serving as an Aggravating Factor Towards His Death Sentence

More than any other consideration, the fact that Cox's conviction in the Davis murder case contributed towards his death sentence in the Stewart murder case weighs towards finding that extraordinary circumstances exist to permit *Martinez* relief. While the *Cox II* court thought the capital aspect of this case is "significant," the court refrained from circumscribing the extent to which this court should weigh Cox's death sentence. *See Cox II*, 757 F.3d at 124, 126 (remanding for a determination of "how, if at all, the capital aspect of this case . . . figure[s] into [a] 60(b)(6) analysis"). In this court's judgment, if a defaulted IATC claim is both meritorious and substantial, and PCRA counsel was ineffective in abandoning that claim, as required by *Martinez*, a death sentence may very well tip the balance of equitable factors towards granting relief. This is because limiting Rule 60(b)(6) *Martinez* relief to cases implicating the death penalty ensures that such relief will be, as required by that Rule, rare and based on extraordinary circumstances, given that the penalty is "the most severe sanction available to society." *Saffle v. Parks*, 494 U.S. 484, 514 (1990). But this is not that case. It is this court's "duty to search for constitutional error with painstaking care . . . in a capital case," but the court has found none rooted in Cox's *Martinez* claim. *Burger v. Kemp,* 483 U.S. 776, 785 (1987).

## III. CONCLUSION

To summarize, Cox filed two Rule 60(b)(6) motions for this court's consideration, which collectively request relief based on the new rule of law articulated by *Martinez*. Consideration of the new ballistics report, which concluded that the two bullets recovered from Davis originated from different firearms, at this stage is improper. Cox's presentation of the new ballistics report constitutes a claim, requiring appellate authorization of his second or successive petition. His presentation of the report is also untimely under either Rule 60(b)(2) or 60(b)(6). Out of an

abundance of caution, the court nevertheless considered in the alternative the merits of the ballistics evidence. In short, the new ballistics report does not materially undermine Cox's conviction because he admitted to shooting Davis twice, and, according to unimpeached ballistics testimony from trial, the possibility that Cox fired twice accidentally is remote. Whether considered with or without the aid of the new ballistics report, none of Cox's procedurally defaulted IATC claims have merit on either element of the *Strickland* test. And although Cox's diligence and his death sentence weigh towards granting relief, such relief must be rooted in substantially meritorious, procedurally defaulted IATC claims. Accordingly, the court denies Cox's two Rule 60(b)(6) motions.

A separate order follows.

BY THE COURT:


*/s/ Edward G. Smith*
EDWARD G. SMITH, J.